Filed 1/31/22  P. v. Yokoi CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RAPHAEL MARCELLO YOKOI,<br><br>    Defendant and Appellant. | C092263<br><br>(Super. Ct. No. 19FE014967) |

A jury convicted Raphael Marcello Yokoi of first-degree murder and found true the allegation that he used a knife in the commission of the murder.  The trial court afterward sentenced Yokoi to 25 years to life plus an additional, consecutive year for the knife enhancement.

Yokoi appeals his conviction on three grounds.  First, he contends the trial court improperly admitted a confession that he made to officers following the murder.  Second, he asserts the trial court wrongly admitted evidence that he stabbed two other people at an auto shop shortly after the murder.  And lastly, he contends the trial court improperly

1

instructed the jury that the auto-shop stabbings could be considered for the purpose of determining whether Yokoi committed the murder charged in this case.

We agree with Yokoi in two respects: The trial court should have excluded evidence of the two auto-shop stabbings and, for that reason, should not have instructed the jury about these stabbings. But because we find the court's errors harmless, we affirm.

BACKGROUND

I.     *Factual Background*

A. *The Murder of Mark Hamilton*

Yokoi once lived with his sister Yvonne Yokoi Peralta and several others at a home on Lindley Lane in Sacramento. Peralta's former fiancé, Mark Hamilton, previously lived there too. But a few months after moving into the home, Peralta and Hamilton discussed Hamilton's moving out. At that time, in late 2018, Peralta was "sort of breaking up with" Hamilton for reasons related to his excessive drinking.

Around the time that Hamilton and Peralta began having relationship problems, Yokoi became aggressive toward Hamilton. On December 9, 2018, for example, Hamilton joined a dinner at his boss's house with a visible injury on his forehead and a black eye. Although Hamilton initially assured his boss's son, Zachary Barsuglia, that he sustained the injuries at work, he later confided that Yokoi had attacked him. He explained that Yokoi had recently approached him and asked whether he believed in God or a higher power. When Hamilton said he did not want to talk about that topic, Yokoi assaulted him and threatened either to "kill him or stab him."

Hamilton added that Yokoi had also attacked him on another occasion in the middle of the night. At the time, Peralta was sick and asked Hamilton to get her sister. After Hamilton attempted to do so, Yokoi awoke and then attacked Hamilton. He also threatened either to kill or stab Hamilton. Apart from relaying these incidents, Hamilton noted that Yokoi would stare at him in a "hostile" manner whenever they were together.

2

Peralta knew of some, if not all, of these incidents. She was nearby, for instance, at the time of the attack that left Hamilton with a black eye. Although she did not see the attack, she heard scuffling and raised voices and saw the aftermath of the assault. She saw, in particular, Hamilton picking himself up off the ground and her sister's boyfriend pushing Yokoi away from Hamilton. She also spoke with Hamilton about Yokoi's conduct. Hamilton on one occasion, for example, told her he could no longer stay at their home because of Yokoi. Hamilton, perhaps in part for that reason, had moved out of the house on Lindley Lane and into a home on Melrose Drive. Hamilton also told Peralta he was scared of Yokoi and wanted to file assault charges and seek a restraining order— conversations that Yokoi overheard. But Peralta discouraged him from filing charges, stating that this was a "family matter and we will handle it."

On December 10, 2018, shortly after Hamilton expressed his concerns about Yokoi to Barsuglia and Peralta, Hamilton failed to show for work. A couple days later, Hamilton's boss, Lisa Wescott, texted Peralta and asked whether he was all right. After several texts back and forth, Wescott called Peralta, expressed concern, and said her son, Barsuglia, would check on him. Peralta, in response, "started sobbing" and acted "almost hysterical"—behavior that Wescott found "unusual."

Barsuglia later drove to Hamilton's home on Melrose Drive. Although he saw Hamilton's truck in the driveway, he received no response when he knocked at the door. After knocking a few more times, he looked through the front door window and saw Hamilton lying face up on the living room floor. Barsuglia afterward found a nearby highway patrol officer and asked for assistance. On entering the home, the officer found Hamilton dead on the floor with congealed blood around his neck.

An autopsy later revealed that Hamilton had been stabbed over 30 times. He was stabbed 11 times on the left side of his head and neck, at least 11 more times on the right side of his head and neck, 10 times in the chest, 3 times in the back, once below the chest, and twice in the hand.

3

B.  *The Investigation*

Following an investigation, officers learned that Hamilton had called 9-1-1 close to 9:00 p.m. on December 10, 2018, but did not speak.  They also searched Peralta's car and her and Yokoi's home on Lindley Lane.  During the search of the car, officers found Hamilton's blood on the driver's side of the center console.  Peralta later explained that although the car was hers, Yokoi often had possession of the sole key for the car, including around the time of Hamilton's murder.  That was because Peralta, following major foot surgery, no longer could walk or drive and relied on her sister and Yokoi for transportation.

During the search of the home, law enforcement attempted to speak with Yokoi.  But Yokoi, though home at the time, hid.  Peralta, who was also home, spoke with the officers.  Although aware that Yokoi was hiding, she initially told them that she had not seen Yokoi in a week and that he did not live at the house.  But at some point, she and her sister pointed out Yokoi's bedroom.  On searching the room, officers found a hunting knife inside a sheath in Yokoi's dresser.  Although the knife had been cleaned and showed no traces of blood, Hamilton's blood was found inside the sheath.

Around eight months after Hamilton's murder, in August 2019, five detectives questioned Yokoi about Hamilton's murder.  At the time, Yokoi had recently been arrested for two other stabbings that occurred at an auto shop in the months following Hamilton's death.  The first attack occurred in January 2019.  That morning, Telesforo A. was delivering and picking up packages at the auto shop, where Yokoi occasionally worked.  As he bent over to pick up one package, Yokoi grabbed his neck and stabbed him in the shoulder with a pair of scissors. The two men afterward struggled over the scissors and, after about five minutes, Telesforo escaped Yokoi and ran to a nearby store. Yokoi followed him for a short distance but then stopped.  Telesforo afterward received treatment at the hospital for a deep wound to his shoulder.  Before the attack, Telesforo had never previously seen Yokoi.

4

The second attack occurred in July 2019. Richard S. had dropped off his car at the shop for a repair and, while he waited in a chair, Yokoi approached and punched him about five times in the head. When Richard stood, Yokoi stabbed him in his side with a kitchen knife. After Yokoi pressed the knife deeper, Richard fell to his knees as blood "gurgl[ed] out of [his] mouth." Yokoi then continued to stab Richard in his side, his chest, and his mouth. The owner of the auto shop, on seeing the attack, grabbed Yokoi and threw him against the wall. The owner then demanded an explanation for the attack. But Yokoi said nothing. Richard spent the next 10 days in the hospital and suffered, among other things, a punctured lung. Richard afterward explained that he had seen Yokoi at the auto shop before when dropping off his car and even tried to talk to him about his work on one car. But, by the time of the attack, Richard had given up trying to talk to him, as he found Yokoi "not very talkative."

The detectives questioned Yokoi about Hamilton shortly after he had been arrested for the second of the two auto-shop stabbings. At the start of the questioning, the detectives advised Yokoi of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed. 694] (*Miranda*). They then falsely claimed that they planned to arrest Peralta for Hamilton's murder and repeatedly played on Yokoi's concerns about his sister's health. One detective, for example, said, "What do you think is gonna happen after we gonna arrest your sister? . . . Do you think she's gonna fare well in jail with her health?" Although Yokoi generally ignored these comments, after nearly two hours of questioning and repeated references to Peralta's health and the struggles she would face in jail, he confessed to murdering Hamilton. He then, after the detectives pressed him to provide details or risk having his sister arrested, described the events surrounding the murder. At the close of the interview, the detectives noted that they would let their "people know to leave your sister alone."

Two days later, two of the detectives from the earlier interrogation returned and questioned Yokoi again. Again, as in the first interview, the detectives advised Yokoi of

5

his *Miranda* rights at the start of the questioning. But unlike the first interview, Yokoi readily revealed the circumstances surrounding the murder with little prompting. He explained that he drove to Hamilton's house in Peralta's car, unlocked the door using Peralta's key, pulled out his knife, and then "hit" Hamilton. After Hamilton fell to the floor, Yokoi straddled him and stabbed him repeatedly. Yokoi then pressed his hand to Hamilton's chest until he was confident Hamilton had stopped breathing.

II.    *Procedural Background*

A few days after Yokoi's second confession, the Sacramento County District Attorney charged him with murder (Pen. Code, § 187, subd. (a)) and the personal use of a knife in the commission of the murder (*id.*, § 12022, subd. (b)(1). Yokoi pled not guilty.

Before trial, the parties filed competing motions in limine. In the prosecution's motion, as relevant here, the prosecutor asked the trial court to find that Yokoi's two confessions to the detectives were admissible. In the alternative, he argued that even if the trial court found Yokoi's first confession was involuntary and inadmissible, it should at least find Yokoi's second confession admissible because it "was separate and independent from the previous interview." The prosecutor also asked the court to find that the two auto-shop stabbings were admissible to show Yokoi's intent when he murdered Hamilton and to show a common scheme or plan. He reasoned that these stabbings were relevant because they showed Yokoi "learned the effectiveness of a stabbing to the head, neck and chest and attempted to duplicate that success in the January and July 2019 assaults."

Defense counsel argued otherwise. Starting with the two confessions, he argued that both were the product of improper coercive pressures because they followed from the detectives' threats to arrest Peralta. Turning next to the two auto-shop stabbings, he argued that neither was admissible to show either intent or a common plan. In terms of intent, he indicated that no additional evidence was necessary to show the intent of Hamilton's murderer; "the only relevant motive in our attack is intent to kill." In terms

6

of common plan, he argued that the three stabbings were not similar enough to show any common plan. He added that, even if the trial court found differently, it should still exclude the auto-shop stabbings because they were "highly prejudicial" and "not terribly probative."

After hearing from the parties, the trial court agreed that Yokoi's initial confession was involuntary and inadmissible. Although the court acknowledged that the detectives read Yokoi his "Miranda rights at the outset," it noted that Yokoi gave "no response to the detectives until they ma[d]e reference to his sister's health, how she would fare in jail, and reiterating that concept that, quote, unquote, 'Family is all we have.' " But the court found Yokoi's second confession admissible, reasoning that the coercive pressures from the first interview did not carry over to the second. The court also found the two auto-shop stabbings admissible based on their having "distinct similarities" with the murder.

A jury afterward convicted Yokoi of first-degree murder and found true the allegation that Yokoi used a knife in the commission of the murder. The trial court sentenced Yokoi to 25 years to life plus an additional, consecutive year for the knife enhancement.

Yokoi timely appealed.

DISCUSSION

I.     *Admission of Yokoi's Second Confession*

We consider first Yokoi's contention that the trial court wrongly admitted his second confession. He argues that his first confession was wrongly coerced, as the trial court found, and that his second confession was nothing more than the tainted product of the initial wrongdoing.

Before turning to the particulars of Yokoi's argument, we start with the relevant standard of review. "In reviewing the voluntary character of incriminating statements, ' "[t]his court must examine the uncontradicted facts surrounding the making of the statements to determine independently whether the prosecution met its burden and proved

7

that the statements were voluntarily given without previous inducement, intimidation or threat. [Citations.] With respect to the conflicting testimony, the court must 'accept that version of events which is most favorable to the People, to the extent that it is supported by the record.' " [Citation.]' [Citation.] 'In order to introduce a defendant's statement into evidence, the People must prove by a preponderance of the evidence that the statement was voluntary. [Citation.] . . . When, as here, the interview was tape-recorded, the facts surrounding the giving of the statement are undisputed, and the appellate court may independently review the trial court's determination of voluntariness.' [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 404.)

### A. *Yokoi's First Confession*

Starting with Yokoi's initial confession to the murder, we accept that this confession was involuntary and inadmissible—which even the Attorney General concedes on appeal.

Although, of course, not all incriminating admissions are inadmissible, officially coerced confessions violate the Fifth Amendment's privilege against compulsory self-incrimination and the guarantee of due process. (See *Withrow v. Williams* (1993) 507 U.S. 680, 688 [123 L.Ed. 2d 407, 417] [the Fifth Amendment bars the admission of "involuntary confessions made in response to custodial interrogation"].) "This is so not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth." (*Rogers v. Richmond* (1961) 365 U.S. 534, 540-541 [5 L.Ed. 2d 760, 766-767].)

In determining whether a defendant's admission is the product of coercion, either physical or psychological, courts "assess[] the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the

8

interrogation." (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226 [36 L.Ed. 2d 854,862].) Courts, in doing so, "determine[] the factual circumstances surrounding the confession, assess[] the psychological impact on the accused, and evaluate[] the legal significance of how the accused reacted." (*Ibid.*)

In this case, the prosecution initially argued that Yokoi's initial confession "should be deemed voluntary and admissible." But now, on appeal, the Attorney General concedes that the facts surrounding Yokoi's initial confession favor a different conclusion. Because these facts, which we covered summarily above, are also relevant to the admissibility of Yokoi's second confession, we will cover them in some detail here.

As discussed earlier, at the initial interview, several detectives repeatedly played on Yokoi's concerns about his sister's health to extract a confession. To start the interview, Detective Prokopchuk showed Yokoi a fake wanted poster for Peralta. He then said, "What do you think is gonna happen after we gonna arrest your sister? . . . Do you think she's gonna fare well in jail with her health?" Detective Lawrence added that Peralta "will go to jail" and "pay for the death of . . . her boyfriend." He then, after receiving only limited responses from Yokoi, said, "She has medical issues, jail is gonna be extremely difficult for her." Still receiving little response from Yokoi, he added, "I get this is hard to know your sister is gonna be gone." He later commented, "[H]ow is she gonna do in [a custodial] setting? Will she be able to thrive? Will she have a sustainable life[?] Like, how is your sister gonna handle that?"

Yokoi, in response to these and similar comments and questions about his sister, noted that he was "hurt[]." He said, "I love my family very much," and added, "It's hurting me that you're tryin', you know what I mean, charge my sister." The detectives, in response, continued to emphasize Peralta's health and the difficulties she would face in jail. Detective Lawrence, for example, said, "She's a loving caring person who is weak. She's in a fragile state." He then noted, "[I]t will be difficult for her in her medical state to sit there in the same seat that you're sitting in across the table from us. So think on it.

9

Help her." Continuing with the same theme, he later added, "You know how hard it's gonna be for her to manipulate her way in jail in—in her physical condition. . . . This is gonna be a—a different environment for her that she doesn't know—she's not safe in."

Detective Prokopchuk, around this time, indicated that Peralta could evade this fate only if Yokoi provided some evidence exculpating her. And although Yokoi tried to provide this evidence, stating that his sister was physically incapable of committing the murder, Detective Prokopchuk discounted this claim. He then indicated that if this was all Yokoi had to say, then Peralta would be arrested and spend a "few years" in jail before having an opportunity to present her defense. He reasoned: "It's not like we arrest her and she goes to the judge and says, hey, your Honor, I'm not capable of doing [this]— doesn't work that way. There's gonna be lawyers. There's gonna be a long time. . . . And [a] few years into it she may have a chance to have her attorney explain her side." Detective Lawrence afterward said, "[Yokoi], you gotta help her. This will—this will kill her."

Only at this point, after Detective Lawrence said Peralta would die unless Yokoi helped her, did Yokoi finally confess. He said, "Before you charge my sister with that, I'll take responsibility for [Hamilton's] death." Considering these facts, the trial court found (and the Attorney General now agrees) that the initial interview was involuntary because Yokoi admitted to the murder only after the detectives made "reference to his sister's health, how she would fare in jail, and reiterating that concept that, quote, unquote, 'Family is all we have.' "

B. *Yokoi's Second Confession*

Taking as a given that Yokoi's initial confession was wrongfully coerced, we consider next whether this confession tainted his subsequent confession as "fruit of the poisonous tree." (*Wong Sun v. United States* (1963) 371 U.S. 471, 488 [9 L.Ed. 2d. 441, 455].)

10

In these types of cases, " 'where—as a result of improper police conduct—an accused confesses, and subsequently makes another confession,' " courts " 'presume[] the subsequent confession is the product of the first because of the psychological or practical disadvantages of having " 'let the cat out of the bag by confessing.' " [Citations.]' [Citation.]" (*People v. McWhorter* (2009) 47 Cal.4th 318, 359 (*McWhorter*).) But that said, " ' "no court has ever 'gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed.' " ' " (*Ibid.*) Courts, instead, have only established a rebuttable presumption of inadmissibility. (*Ibid.*)

A prosecutor may rebut this presumption with evidence " 'establishing a break in the causative chain between the first confession and the subsequent confession.' [Citation.]" (*McWhorter, supra*, 47 Cal.4th at p. 359.) The relevant question in these types of cases is not whether the subsequent confession would have occurred even absent the coerced initial confession. It is instead " ' " 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " [Citations.] The degree of attenuation that suffices to dissipate the taint "requires at least an intervening independent act by the defendant or a third party" to break the causal chain in such a way that the second confession is not in fact obtained by exploitation of the illegality. [Citations.]' [Citation.]" (*Id.* at p. 360.)

In deciding whether a second confession has been tainted by the initial coerced statement, courts consider the totality of circumstances. Relevant considerations include, among others, a "break in the stream of events" between confessions (*Clewis v. State of Tex.* (1967) 386 U.S. 707, 710 [18 L.Ed. 2d 423, 427]), the provision of *Miranda* warnings before the second confession (*id.* at p. 711), "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators" (*Oregon v. Elstad* (1985) 470 U.S. 298, 310 [84 L.Ed. 2d 222, 233]

11

(*Elstad*); see also *McWhorter, supra*, 47 Cal.4th at p. 360-361 [discussing "indices of attenuation"]).

Considering the facts of the case before us, we find that the prosecution carried its burden to show that Yokoi's second confession was sufficiently "purged of the primary taint." (*McWhorter, supra*, 47 Cal.4th at p. 360, internal quotation marks omitted.) We start with several considerations tending to undermine the prosecution's position. First, both interrogations occurred at the same county jail and in the very same room. Both, in other words, occurred "in the same compelling surroundings" that elicited the first coerced confession. (*Miranda, supra*, 384 U.S. at p. 496.) Both interrogators at the second confession, moreover, were also present at the initial confession. And one of those interrogators, Detective Lawrence, even participated in referencing Peralta's fragile state and the harm she would suffer in jail in the initial interview. We find these two considerations—the same location and some of the same interrogators—conveyed a sense of continuity with the first interview and weigh in favor of suppression.

But we find other considerations strongly favor admissibility. First, and most importantly, the detectives assured Yokoi that they would stop pursuing Peralta well before they questioned Yokoi a second time. The detectives, in this way, removed the threat that caused the initial interview to be improperly coercive. Again, at the initial interview, the detectives extracted Yokoi's confession through their threats to arrest Peralta. Even after Yokoi initially confessed, moreover, the detectives pressed the point to ensure that he gave additional details. Detective Lawrence, for example, said: "[R]ight now we're still going down two paths. We still have to go after your sister or are you just being the brother who's saying, yeah, I did it, because you don't want your sister to get in trouble 'cause you're a family man—you're a great man. But until we have all of this we have to keep going after her. The minute you tell me what's goin' on here—what happened that day, I'll call off—I'll call my guys right now on speaker phone and I'll tell them to—if they have her, let her go. If they have—don't have her, to stop

12

hunting her." But as the initial interview came to a close, and after Yokoi offered additional details of the murder, the detectives removed this threat to Peralta. They told Yokoi that they would "let people know to leave your sister alone." The detectives then asked, "Do you wanna hear that phone call being made, [Yokoi]?" And when Yokoi declined to respond, they said, "We'll take care of it"; "I promise you it's taken care of."

Second, we find the time between the two confessions also favors admissibility. " '[T]o draw any conclusions from [the] timing of [the defendant's] confessions, we must consider the temporal proximity factor in conjunction with the presence of intervening circumstances.' [Citation.]" (*United States v. Shetler* (9th Cir. 2011) 665 F.3d 1150, 1159 (*Shelter*) [confession following illegal search]; see *Watson v. DeTella* (7th Cir. 1997) 122 F.3d 450, 455 ["there is simply no bright-line test for determining the amount of time needed to adequately isolate a later statement from a prior coerced confession"].) In this case, we have a significant intervening circumstance—the detectives, again, removed the threat that caused the initial interview to be improperly coercive two days before Yokoi's second confession. Following the removal of the threat to Peralta, along with the passage of several days, Yokoi should have felt free to decline to speak with the detectives further. The detectives, after all, had assured him that they would "leave [his] sister alone." (See *Holland v. McGinnis* (7th Cir. 1992) 963 F.2d 1044, 1050 [confession that occurred 6 hours after a coerced confession found voluntarily where "authorities had eliminated the most coercive elements . . . before [the defendant] tendered his second confession"].)

But even with the threat to Peralta averted, Yokoi still decided to disclose more details about the murder at the interview two days later—and he started to do so, notably, even before the detectives began questioning him about the murder. To provide a little more background, in the initial interview, Yokoi said he cleaned up after he murdered Hamilton, but indicated he could not remember how. "I guess I just cleaned up," he said, after the detectives asked whether he took a shower or used the sink at Hamilton's house.

13

Following up on that point in the second interview—and before the detectives even asked about the murder—Yokoi noted that he had thought about it and "d[id]n't really remember if [he] used th[e] sink" "[a]t the scene." He then, in response to questions from the detectives, readily admitted various details about the murder.

Third, further favoring admissibility, the detectives advised Yokoi of his *Miranda* rights at the start of the second interview. "*Miranda* warnings are an important factor, to be sure, in determining whether [a] confession is obtained by exploitation of an [earlier coerced confession]." (*Brown v. Illinois* (1975) 422 U.S. 590, 603 [45 L.Ed. 2d 416, 427] [discussing "exploitation of an illegal arrest"].) That said, they do not themselves purge the taint of a coerced confession (see *id.* at p. 605) and, in some cases, they may do little at all. They have little curative effect, for instance, when the same "coercive police tactics . . . that render the initial admission involuntary [also] undermine the suspect's will to invoke his rights once they are read to him" at a subsequent interrogation. (*Elstad, supra*, 470 U.S. at p. 317; see *Missouri v. Seibert* (2004) 542 U.S. 600, 616-617 [159 L.Ed. 2d 643, 657-658] (plur. opn. of Souter, J.) [finding inadmissible a confession obtained using a two-step interrogation strategy that called for the deliberate withholding of the *Miranda* warning until after the suspect confessed]; *id.* at p. 618 (conc. opn. of Kennedy, J.) [finding the same but relying on a different analytical approach]).

In this case, the detectives resorted to coercive police tactics in their initial interview that, we accept, undermined Yokoi's will to invoke his rights under *Miranda*. And had the detectives continued to resort to these same tactics in their second interview, we would have agreed that these tactics would have continued to "undermine [Yokoi's] will to invoke his [*Miranda*] rights." (*Elstad, supra*, 470 U.S. at p. 317.) Under that set of facts, Yokoi could have made a credible claim that he hesitated to invoke his *Miranda* rights for fear of subjecting his sister to arrest and potential harm. But those are not our facts. Again, the detectives had removed the threat to Peralta that caused the initial interview to be improperly coercive days before Yokoi made his second confession. For

14

that reason, we cannot say that the detectives' earlier coercive tactics had a lingering effect that undermined Yokoi's will to invoke his *Miranda* rights. (See *Lyons v. State of Okl.* (1944) 322 U.S. 596, 604 [88 L.Ed. 1481, 1486] (*Lyons*) [finding, pre-*Miranda*, that a confession that occurred 12 hours after a coerced confession was voluntarily in part because defendant had been warned "that anything he might say would be used against him and that he should not 'make a statement unless he voluntarily wanted to' "]; *McWhorter, supra*, 47 Cal.4th at p. 360 [*Miranda* warnings after coerced confession favored a finding of attenuation]; *McDaniel v. Polley* (7th Cir. 2017) 847 F.3d 887, 894 [*Miranda* warnings after coercive illegal arrest "tend[ed] to support attenuation"].)

Lastly, also favoring admissibility, Yokoi displayed little if any hesitation in the second interview and even expressed relief in disclosing his conduct. Unlike in the first interview, he readily revealed details about the murder and occasionally spoke in long, narrative form. He also acknowledged that he "fe[lt] better" after getting the murder "off [his] chest." We find these circumstances lend further support for finding Yokoi's second confession admissible. (See *People v. Neal* (2003) 31 Cal.4th 63, 85 [finding that defendant's admission that he was " 'feel[ing] guilty,' and that guilt 'was weighing pretty heavy on [his] mind,' " "weigh[ed] in favor of the voluntariness of defendant's initiation of the second interview"].)

Attempting to counter these considerations in favor of admissibility, Yokoi argues that the second interview carried "exactly the same pressures to clear his sister." Because the detectives sought a follow-up interview and, at the start of the interview, mentioned they had spoken to Peralta, Yokoi claims that "the interview would plainly be understood by [him] as a needed follow up to confirm [his] story—and to confirm exclusion of [Peralta] as a perpetrator or accomplice—by comparing (plugging in) [his] accounts with what [Peralta] told police and the other evidence being turned up."

But Yokoi neglects to mention, at least in his opening brief, that the detectives told Yokoi at the close of the first interview that they would let their "people know to leave

15

your sister alone." The detectives' explicit assurance that they would leave Peralta alone, again, is a critical consideration in our analysis. And although, in his reply brief, Yokoi argues that the detectives' assurance was inadequate, we find differently. In Yokoi's view, the detectives needed to do more than offer to leave Peralta alone; they needed to confirm that "she was completely off the hook," explain that she "never was really a suspect" at all, or inform Yokoi that he had no need to talk further "to ensure his sister was really off the hook." But although we agree a statement of that sort would make this case easier, we decline to find it necessary. Because Yokoi had been told that the officers would leave Peralta "alone" following his initial confession, and because we find nothing in the second interview suggesting a retraction of this assurance, we cannot find, as Yokoi claims, that the second interview carried "exactly the same pressures to clear his sister."

In sum, considering the record in its entirety, we conclude that the prosecution carried its burden to show " 'a break in the causative chain between the first confession and the subsequent confession.' [Citation.]" (*McWhorter, supra*, 47 Cal.4th at p. 359.) Although some considerations, to be sure, weigh in favor of suppression—including the place of the second interrogation and the participants in that interrogation—we find that other considerations outweigh these details and favor admissibility. Most importantly, again, the detectives removed the coercive pressure that led to the initial confession days before they questioned Yokoi a second time. And despite the removal of this coercive pressure, Yokoi readily confessed to the murder at the second interview following a *Miranda* advisement and even offered details about the murder before the detectives began their questioning. On these facts, we are satisfied that Yokoi's second confession was sufficiently shed of the taint of his initial confession to be deemed admissible. We perhaps cannot say that Yokoi's subsequent confession would have occurred even absent the initial wrongdoing. But we can at least conclude that this confession was obtained, not through exploitation of the initial illegality, but " ' " 'by means sufficiently

16

distinguishable to be purged of the primary taint.' " [Citations.]' [Citation.]"
(*McWhorter, supra*, 47 Cal.4th at p. 360; see also *Lyons, supra*, 322 U.S. at p. 604
[confession that occurred 12 hours after a coerced confession found voluntarily where the
abusive conditions that led to the initial confession had been removed and where
defendant had been warned "that anything he might say would be used against him and
that he should not 'make a statement unless he voluntarily wanted to' "].)

II.      *The Auto-Shop Stabbings*

A. *Admission of the Stabbings and the Associated Jury Instructions*

We consider next Yokoi's several contentions concerning the two stabbings at the
auto shop.  Yokoi asserts that the trial court both abused its discretion and deprived him
of a fair trial when it allowed the prosecution to present evidence of these stabbings.  He
also, relatedly, asserts that the trial court wrongly instructed the jury that it could consider
the stabbings to show identity.  We address each of these contentions in turn, starting
with the trial court's decision to allow evidence of the auto-shop stabbings.

The two stabbings were both "uncharged offenses"—that is, offenses that were
discussed but not charged in the current case.  Evidence Code section 1101, subdivision
(a) generally bars admission of evidence of these types of offenses to prove the
defendant's "conduct on a specified occasion."  So, for example, a prosecutor seeking to
persuade a jury that a defendant committed an assault on one "specified occasion"
generally cannot introduce evidence that the defendant also committed another assault on
another occasion.  Evidence Code section 1101, subdivision (b), however, "provides a
limited basis for admission" of this type of evidence.  (*People v. Williams* (1988)
44 Cal.3d 883, 904.)  As relevant here, it allows the introduction of a defendant's
uncharged offenses "when relevant to prove some fact (such as motive, opportunity,
intent, preparation, plan, knowledge, identity, [or] absence of mistake or accident . . .)
other than his or her disposition to commit such an act."  (Evid. Code, § 1101, subd. (b).)

17

In this case, the prosecutor sought to introduce evidence of the auto-shop stabbings under this statute. He argued that these stabbings were relevant to prove both Yokoi's intent and a common plan or scheme. Focusing on common plan or scheme, the prosecutor reasoned that Yokoi had a common plan to stab people in the head, neck, and chest. The trial court, over defense counsel's objection, agreed the stabbings were admissible for the reasons the prosecution argued. It also, considering the jury instructions, ultimately found the stabbings relevant to establish the identity of the person who committed the murder. Per the jury instructions, the jury could consider the two stabbings "for the limited purpose of deciding whether: the defendant was the person who committed the offense alleged in this case; [and whether] the defendant had a plan or scheme to commit the offense alleged in this case." The instructions, for reasons that are not entirely clear from the record, did not instruct the jury that the stabbings were also relevant to show intent.

Challenging the trial court's decision, Yokoi asserts, and we agree, that neither of the two auto-shop stabbings should have been admitted to show identity, common scheme, or intent. We start with the admission of the stabbings to show identity. "To be relevant on the issue of identity, the uncharged crimes must be highly similar to the charged offenses." (*People v. Kipp* (1998) 18 Cal.4th 349, 369 (*Kipp*).) In particular, the charged and uncharged offenses must be so similar that they "display a ' "pattern and characteristics . . . so unusual and distinctive as to be like a signature." ' [Citation.]" (*Id.* at p. 370.) The charged and uncharged offenses, in other words, must be similar enough "to support the inference that the same person committed both acts." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403 (*Ewoldt*).)

Applying those principles here, we cannot say that the stabbings were " ' "so unusual and distinctive as to be like a signature." ' [Citation.]" (*Kipp, supra*, 18 Cal.4th at p. 369.) Nor can we say that the similarities between the stabbings were sufficiently strong "to support the inference that the same person committed [all three] acts."

18

(*Ewoldt, supra*, 7 Cal.4th at p. 403.)  One involved the stabbing of Peralta's fiancé, Hamilton, who Yokoi disliked and had previously threatened to kill.  The two others, to use the trial court's words, involved stabbings of "straight-up strangers" at an auto shop, neither of whom had done anything to incite Yokoi.  Again, one of the victims, Telesforo, had never seen Yokoi before being attacked.  And although the other, Richard, had seen Yokoi on prior occasions when he dropped off his car for repairs, he never had a meaningful interaction with Yokoi.  The stabbing of Hamilton and the two auto-shop stabbings, in this important respect, were highly distinct from one another.  Distinguishing the acts further, all involved different stabbing instruments:  Hamilton was stabbed with a hunting knife, Telesforo was stabbed with scissors, and Richard was stabbed with a kitchen knife.  Considering these details, although we perhaps could agree that the two auto-shop stabbings were highly similar to one another, we cannot agree that these two stabbings were also so similar to the stabbing of Hamilton as to be like a signature.

We find that true even though, as the Attorney General argues, the three acts had some similarities.  In terms of similarities, the Attorney General argues that it is noteworthy that Yokoi stabbed the three men "in the head, neck, and chest areas . . . with a sharp object" and sought to "harm or kill rather than rob."  But little of this is particularly unusual in cases involving stabbings.  The natural tool to use in a stabbing, after all, is a sharp object.  And as defense counsel reasonably noted at the trial level, "[t]he natural place to stab from a standing position would tend to be the head, the shoulders, the neck, the chest"—the upper body, in other words.  Indeed, a quick search on Westlaw shows hundreds of cases discussing stabbings of the chest in the last decade alone.  Perhaps, had Yokoi used a particularly distinct sharp object in the stabbings, or at least stabbed in a particularly distinct pattern, we would agree that the stabbings here were sufficiently unusual.  (See *People v. Sánchez* (2016) 63 Cal.4th 411, 453 [defendant's use and possession of a stun gun, which was "especially [unusual]" at the

19

time of crime, supported admission of prior act to show identity]; *People v. Prince* (2007) 40 Cal.4th 1179, 1223 [expert opined that "tightly clustered six-and-a-half-inch stab wounds to the chest" are rare].) But none of the random instruments used in this case were particularly distinct. Nor was there a particularly distinct pattern in the stabbings. Again, Richard was stabbed four times in his side, chest, and mouth; Telesforo was stabbed once in the shoulder; and Hamilton was stabbed over 30 times in his head, neck, chest, below the chest, back, and hand.

In the end, to accept the Attorney General's argument, we would have to find this: A defendant who has, on three different occasions, stabbed (or shot, punched, kicked, etc.) a person without taking any items, has committed acts so unusual, so distinct, that the acts can be said to be like a signature. (*Kipp, supra*, 18 Cal.4th at p. 369.) We decline to accept this position, even when viewing the evidence in this case in the light most favorable to the trial court's ruling. Again, we acknowledge that the three different stabbings here had some similarities. They were all stabbings, after all. But as covered, we find the stabbing of a close and disliked acquaintance at his home, on the one hand, and the stabbings of two random strangers at an auto shop, on the other, are acts that are too distinct to be admissible to prove identity. (See *People v. Rogers* (2013) 57 Cal.4th 296, 326 [to be relevant to establish identity, the charged and uncharged offenses must be so unusual and distinctive that they " ' " 'virtually eliminate[] the possibility that anyone other than the defendant committed the charged offense' " ' "].)

We turn next to the admission of the stabbings to show a common plan or scheme. Under this theory of relevance, although the charged and uncharged acts must have a certain degree of similarity, they need not be as similar as acts offered to establish identity. (*People v. Scully* (2021) 11 Cal.5th 542, 587.) "[T]o establish the existence of a common design or plan, ' "the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual." ' [Citation.]" (*Ibid.*)

Considering this standard, we find the two auto-shop stabbings were not admissible to prove a common plan or design. In the prosecutor's telling at the trial level, Yokoi had developed a scheme to stab people in their upper bodies. In particular, to quote the prosecutor, Yokoi had "learned the effectiveness of a stabbing to the head, neck and chest." The Attorney General repeats this type of argument on appeal, stating that Yokoi had "a similar plan to stab all three victims with a sharp object in the head, neck, and chest areas." But an alleged plan of stabbing people around the upper body, without more, is far "too broad to describe a meaningful plan" under Evidence Code section 1101. (*Bowen v. Ryan* (2008) 163 Cal.App.4th 916, 924-925 [dentist's mistreatment of patients was "too broad to describe a meaningful plan"].)

To find otherwise would mean that any two stabbings, any two shootings, and any two assaults would almost always suffice to establish a common plan or scheme. We decline to endorse that proposition. Although we could perhaps agree, considering other details, that the two auto-shop stabbings were similar enough to one another to be considered part of a common plan, we cannot agree that these two stabbings were also sufficiently similar to the stabbing of Hamilton to show that it too was part of that same common plan. (See *People v. Sam* (1969) 71 Cal.2d 194, 204-205 [defendant's prior kicking of his girlfriend in the ribs on one occasion and his kicking of another person on another occasion found inadmissible to show a common plan or scheme in a subsequent murder case where defendant stomped on the victim's stomach; "[t]he acts were independent of one another and apparently spontaneous in each instance"].)

We consider next the admission of the stabbings to show intent. Under this theory of relevance, courts require "[t]he least degree of similarity (between the uncharged act and the charged offense)." (*Ewoldt, supra*, 7 Cal.4th at p. 402.) " '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e.,

21

criminal, intent accompanying such an act. . . .' In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." ' " (*Ibid.*, internal citations omitted.)

Turning to our facts, as relevant here, the prosecutor at the trial level sought admission of the auto-shop stabbings to show that Yokoi intended to harm or kill Hamilton. The Attorney General argues the same on appeal, asserting that these two stabbings were relevant to show that Yokoi intended to "harm or kill." But even assuming that were true, we would still find the stabbings inadmissible under Evidence Code section 352. Under that statute, courts can exclude evidence if its probative value is substantially outweighed by the probability that its admission would "(a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." In this case, the auto-shop stabbings were highly prejudicial. They depicted Yokoi as a serial stabber, with anyone in his vicinity a potential victim. But although highly prejudicial, they carried little relevance on the question of whether Hamilton's murderer had the intent to harm or kill, as even defense counsel accepted that Hamilton "was killed deliberately by somebody." As a result, as Yokoi asserts, even if the auto-stabbings were relevant to show intent to harm or kill, the trial court nonetheless should have excluded the evidence under Evidence Code section 352. (See *People v. Leon* (2008) 161 Cal.App.4th 149, 169 [trial court abused its discretion in admitting uncharged evidence that "was 'merely cumulative regarding an issue that was not reasonably subject to dispute' "].)

For all these reasons, we agree, as Yokoi argues, that the trial court abused its discretion in admitting the auto-shop stabbings to show identity, common plan, and intent. But we reject Yokoi's additional claim that the admission of this evidence deprived him of his right to a fair trial under the Due Process Clause. As the Supreme Court has explained, "[o]nly when evidence 'is so extremely unfair that its admission

violates fundamental conceptions of justice,' [citation], have we imposed a constraint tied to the Due Process Clause." (*Perry v. New Hampshire* (2012) 565 U.S. 228, 237 [181 L.Ed. 2d 694, 706] [citing, as an example, that the Due Process Clause prohibits a prosecutor's " 'knowin[g] use [of] false evidence' "].)  For that reason, "[t]he high court has repeatedly stressed that, as a general matter, the federal Constitution does not mandate particular rules concerning the admission of evidence." (*People v. Fuiava* (2012) 53 Cal.4th 622, 697; see also *People v. Cahill* (1993) 5 Cal.4th 478, 500 [the California electorate, in enacting Proposition 8, "largely eliminat[ed] state law rules that restricted the admissibility of relevant evidence more narrowly than was required by the federal Constitution"].)  Considering the requisite "extreme[] unfair[ness]" required to implicate the Due Process Clause in cases involving improperly admitted evidence, we reject Yokoi's contention that the mere admission of the auto-shop stabbings deprived him of a fair trial.  (See *id.* at pp. 482, 501-502, 511 [even the erroneous admission of an involuntary confession does not necessarily deprive a defendant of a fair trial].)

Lastly, moving beyond the trial court's admission of the auto-shop stabbings under Evidence Code section 1101, we turn to the court's jury instructions associated with the stabbings.  Yokoi, again, argues that the trial court improperly instructed the jury that it could consider the auto-shop stabbings for the purpose of determining the identity of the person who murdered Hamilton.  Because, for the reasons discussed, we find that the court improperly admitted evidence of the auto-shop stabbings, we agree that the court's instructing the jury that it could consider this evidence to establish identity was also improper.

B. *Prejudice*

Having found that the trial court improperly admitted evidence of the auto-shop stabbings and instructed the jury about this evidence, we consider next whether the court's errors were harmless.

23

"Whether an error proves harmless or not depends on the kind of error at issue. In particular, it depends on whether the error constitutes a lapse under the federal Constitution or state law, and whether it is structural in nature. We evaluate nonstructural state law error under the harmlessness standard set forth in [*People v. Watson* (1956) 46 Cal.2d 818, 837-838 (*Watson*)]," which requires reversal when "it is ' "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' [Citations.]" (*People v. Gonzalez* (2018) 5 Cal.5th 186, 195.) We evaluate nonstructural "violations of the federal Constitution under the standard set forth in *Chapman v. California* (1967) 386 U.S. 18, [17 L.Ed. 2d 705, 87 S.Ct. 824], which requires reversal unless the error is harmless 'beyond a reasonable doubt.' [Citation.]" (*Id.* at pp. 195-196.) And we consider structural errors, whether premised on state law or federal constitutional law, to be *per se* prejudicial. (*Id.* at p. 196.)

According to Yokoi, all three of these standards are potentially implicated here. First, suggesting a structural error, he argues that the trial court's jury instruction was *per se* prejudicial because the jury might have identified him as Hamilton's murderer based on the improper instruction. Alternatively, he argues that, "[a]t a minimum, because the error implicates [his] federal constitutional rights, the federal constitutional prejudice standard applies"—that is, the standard described in *Chapman*. Lastly, as a second alternative, he argues that "reversal of the judgment is required" under the standard described in *Watson*.

We find no reversible prejudice. To start, we find Yokoi's first two arguments rely on the wrong standard for evaluating prejudice. In the first, in arguing that the trial court's jury instruction was *per se* prejudicial, Yokoi appears to reason that the court's instruction was equivalent to an instruction that omits an element of the offense. He cites in support, for example, the Ninth Circuit's decision in *United States v. Stein* (9th Cir. 1994) 37 F.3d 1407, in which the court found that a jury instruction that omitted an element of the offense was *per se* prejudicial. (*Id.* at p. 1410.) But we do not find these

24

two types of instructions to be the same. And in any event, the court's decision in *Stein* is no longer good law. (See *Neder v. United States* (1999) 527 U.S. 1, 4 [144 L.Ed. 2d 35, 44] (*Neder*) [jury instruction that omits an essential element of the charged offense is subject to harmless error review]; *People v. Mil* (2012) 53 Cal.4th 400, 415 (*Mil*) ["the omission of one or more elements of a charged offense or special circumstance allegation is amenable to review for harmless error under the state and federal Constitutions, at least as long as the omission 'neither wholly withdrew from jury consideration substantially all of the elements . . ., nor so vitiated all of the jury's findings as to effectively deny defendant[] a jury trial altogether' "].)

Yokoi's second argument similarly relies on the wrong standard. In claiming that the trial court's jury instruction is subject to review under the *Chapman* standard, Yokoi again appears to reason that the court's instruction was equivalent to an instruction that omits an element of the offense. Instructions of that sort, we agree, implicate federal constitutional rights, and are reviewed under the *Chapman* standard. (See *Neder, supra*, 527 U.S. at p. 4; *Mil, supra*, 53 Cal.4th at p. 409.) But again, we decline to find the instruction here equivalent to one that omits an element of the offense.

We are left, then, with Yokoi's final argument premised on the *Watson* standard— which we find to be the correct standard. As our Supreme Court has found in similar cases, *Watson* supplies the appropriate standard for considering the wrongful admission of uncharged offenses. (*People v. Thomas* (2011) 52 Cal.4th 336, 356 & fn. 20.) And as the court has demonstrated in other cases, *Watson* also provides the appropriate standard for considering improper jury instructions on the use of uncharged offenses. (*People v. Foster* (2010) 50 Cal.4th 1301, 1332-1333.)

Applying that standard here, and considering the overwhelming evidence in favor of guilt, we find that the admission of the two auto-shop stabbings, along with the associated jury instructions, was plainly harmless. To start, Yokoi confessed to the murder. That alone is powerful evidence of guilt. As the United States Supreme Court

25

has noted, a " 'defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.' [Citation.]" (*Arizona v. Fulminante* (1991) 499 U.S. 279, 296 [113 L.Ed. 2d 302, 322; see also *People v. Bradford* (2008) 169 Cal.App.4th 843, 855 ["A confession is uniquely powerful evidence."].)

Even setting aside Yokoi's confession, the circumstantial evidence in favor of guilt was powerful. First, Yokoi had physically assaulted Hamilton in the past, once leaving a black eye, and twice threatened either to kill or stab him. Second, Yokoi possessed the knife used in the murder. After searching his room, officers found a knife inside a sheath in his dresser. And although the knife had been cleaned, officers found Hamilton's blood inside the sheath. Third, Yokoi possessed the keys to the car that had Hamilton's blood smeared on the center console. Although, again, the car was Peralta's, Peralta could not drive and testified that Yokoi had her keys at the time of the murder. And fourth, evidencing a sense of guilt, Yokoi hid from law enforcement after they searched his home following Hamilton's murder. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1054-1055 [a jury may consider a defendant's flight after the commission of a crime in deciding the question of guilt or innocence].)

Considering the overwhelming evidence in favor of guilt, we conclude that it is not reasonably probable, or even probable at all, that a result more favorable to Yokoi would have been reached in the absence of the evidence of the auto-shop stabbings and the associated instructions.

III.    *Cumulative Error*

Lastly, we briefly consider Yokoi's claim that the cumulative effect of the trial court's errors, both of which related to the admission of the auto-shop stabbings, deprived him of due process and a fair trial. Considering these errors in the context of the trial as a whole, we are satisfied that these errors were harmless, whether considered individually or collectively. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)

26

## DISPOSITION

The judgment is affirmed.

_____\s\_____,
BLEASE, Acting P. J.

We concur:

_____\s\_____,
ROBIE, J.

_____\s\_____,
MAURO, J.