In the

# United States Court of Appeals

### For the Seventh Circuit

No. 15-3638

MARSHALL MCDANIEL,

*Petitioner-Appellant*,

*v.*

CECIL POLLEY, Warden,

*Respondent-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 C 7375 — **Joan H. Lefkow**, *Judge*.

ARGUED NOVEMBER 4, 2016 — DECIDED FEBRUARY 9, 2017

Before FLAUM and KANNE, *Circuit Judges*, and MAGNUS-STINSON, *District Judge*.*

KANNE, *Circuit Judge*. In 2001, police officers arrested Marshall McDaniel while investigating his girlfriend's murder. McDaniel confessed during postarrest interrogation. After pleading not guilty, McDaniel unsuccessfully attempted

*The Honorable Jane Magnus-Stinson, of the United States District Court for the Southern District of Indiana, sitting by designation.

to suppress his confession. He was convicted in Illinois state court; on direct appeal, the Illinois Appellate Court affirmed.

After his state petition for postconviction relief was denied, McDaniel petitioned the federal district court for a writ of habeas corpus under 28 U.S.C. § 2254. The district court denied the petition. McDaniel now argues that appellate counsel was ineffective for failing to argue that his initial arrest was unlawful and that his confession was inadmissible as fruit of the unlawful arrest.

On appeal, we review the Illinois Appellate Court's decision to deny McDaniel's petition for postconviction relief. *People v. McDaniel*, No. 1-06-3283, slip op. (Ill. App. Ct. Sept. 30, 2009). Because McDaniel was not prejudiced by appellate counsel's failure to raise his Fourth Amendment claim, we affirm.

## I. BACKGROUND

On January 16, 2001, at 9:15 a.m., Officers found DeAngular Moore's body in a high school parking lot. Moore's body was lying next to a bloodied garbage can marked 8055 South Harvard. Because she did not have identification with her at the time of her death, Detective Brownfield sought to identify Moore by showing community members her photo. At 5 p.m., before Moore was identified, Detective Brownfield received a call from Officer Blackman. Officer Blackman told Detective Brownfield that he had seen a black male, 6'1", 185 pounds, and in his forties, pulling a garbage can at 2 a.m. that morning. Officer Blackman said that the man pulled the garbage can into the high school parking lot and then exited empty handed.

After Detective Brownfield talked to Officer Blackman, a woman identified Moore. The woman told Detective Brownfield that Moore lived with her boyfriend—McDaniel—and described him as a black male, 6′3″, 185 pounds, and in his late forties. The woman took Detective Brownfield to a man called "Radio." Radio identified Moore and then took Detective Brownfield and several other officers to McDaniel's house—four doors from the address marked on the bloodied garbage can. McDaniel was not home, so the officers left.

Four officers returned about an hour later, at 8:30 p.m. They did not have a search or arrest warrant. At trial, two of the officers testified that they did not think that they had probable cause to arrest McDaniel at that time. The officers testified that they went to McDaniel's house only to investigate Moore's death. When the officers knocked, McDaniel answered and consented to the officers' request to come inside.

Once inside, the officers asked McDaniel if he knew why they were there, and he allegedly responded, "[B]ecause my girlfriend was murdered." (R. 17-1 at 81); (R. 17-2 at 96).[1] At the officers' request, McDaniel allowed the officers to search his house. When McDaniel began acting nervous and fidgety, an officer put McDaniel in handcuffs. The officer told McDaniel that he was not under arrest and removed the handcuffs about five minutes later once McDaniel calmed down. At around 9 p.m., the officers asked McDaniel if he

---

[1] McDaniel denied making this statement, but he testified at trial that he knew Moore was dead before the officers arrived because Radio had told him as much earlier in the day.

would come to the police station for further questioning. McDaniel acquiesced, and the officers drove him back to the station in a police car.

While on their way to the station, one of the officers called Detective Brownfield to update him. Detective Brownfield told the officer that Officer Blackman had just identified McDaniel in a photo-array lineup. Detective Brownfield directed the officers to bring McDaniel to a particular station. McDaniel arrived at the station at 10:30 p.m. At midnight, Officer Blackman identified McDaniel in a corporal lineup.

At the police station, McDaniel was placed in an interrogation room, read his *Miranda* rights, and then questioned three separate times over twenty-four hours. During the third round of questioning, McDaniel confessed to the murder and signed a written confession prepared by an Assistant State's Attorney.[2]

Despite his confession, McDaniel pled not guilty. McDaniel moved to suppress his confession on the ground that it and any related evidence was fruit of his arrest, which he argued violated the Fourth Amendment. The trial court ruled that the officers arrested McDaniel when they handcuffed him at his home and later drove him to the police station. But the trial court imputed Officer Blackman's photo-array identification to the arresting officers, which gave them probable cause to arrest McDaniel at that time. With

---

[2] Despite devoting significant time in his brief to describing the improper tactics that the investigating officers allegedly used during the custodial interrogation, on appeal, McDaniel does not argue that his confession was improperly coerced.

his confession deemed admissible, a jury convicted McDaniel of murdering Moore.

On direct appeal, McDaniel's appointed appellate counsel argued only one issue—that the prosecution's reference to McDaniel's refusal to take a polygraph while in custody denied him due process of law. Appellate counsel, ignoring McDaniel's prodding, made no argument about the arrest or the admissibility of his confession. The appellate court affirmed the conviction.

McDaniel subsequently filed a petition for postconviction relief in Cook County Circuit Court. In that petition, McDaniel argued that he had been denied effective assistance of appellate counsel because appellate counsel had not argued that his confession should have been suppressed as fruit of an unlawful arrest. The circuit court denied the petition.

The Illinois Appellate Court affirmed. Applying the Supreme Court's two-pronged test for ineffective-assistance-of-counsel claims defined in *Strickland v. Washington*, 466 U.S. 668 (1984), the court held that appellate counsel was not ineffective in failing to raise the Fourth Amendment claim because the officers had probable cause to arrest McDaniel when they went to his house. The court held that Officer Blackman's description of the man pulling the garbage can— which Detective Brownfield relayed to the arresting officers—created probable cause justifying the arrest. The court cited Illinois case law for the proposition that "a defendant is not prejudiced by counsel's failure to raise" a nonmeritorious claim on appeal and concluded that "appellate counsel was not ineffective for electing not to raise the legality" of the arrest. (R. 17-5 at 43–44.)

McDaniel petitioned the district court for a writ of habeas corpus under 28 U.S.C. § 2254. The district court held that the Illinois Appellate Court erred in holding that the arresting officers had probable cause to arrest McDaniel. Nevertheless, the district court held that McDaniel had not shown prejudice as *Strickland* requires. A significant intervening circumstance, that is, Officer Blackman's identification of McDaniel in the photo-array lineup, "would have probably led the appellate court to sustain the trial court's denial of the motion to suppress." (R. 34 at 18.) Consequently, the district court denied McDaniel's petition. The district court issued a certificate of appealability as to McDaniel's ineffective-assistance-of-counsel claim. This appeal followed.

## II. ANALYSIS

We review *de novo* a district court's denial of a habeas petition. *Dansberry v. Pfister*, 801 F.3d 863, 866 (7th Cir. 2015). As we have repeatedly said, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") circumscribes our review of a claim for habeas relief that a state court has already adjudicated on the merits. *E.g.*, *King v. Pfister*, 834 F.3d 808, 813 (7th Cir. 2016).

When the state court applies the correct rule as established by Supreme Court precedent to a claim, the petitioner must show that the state court's decision was an "unreasonable application" of that precedent to the facts of the case. *Emerson v. Shaw*, 575 F.3d 680, 684 (7th Cir. 2009) (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)). The qualifier "unreasonable" often controls our review: unreasonable means more than ordinary disagreement with the state court's decision. *McManus v. Neal*, 779 F.3d 634, 649 (7th Cir. 2015). A state court's decision is reasonable, even if incorrect in our

independent judgment, so long as "'fairminded jurists could disagree' on the correctness of the state court's decision." *Quintana v. Chandler*, 723 F.3d 849, 855 (7th Cir. 2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). "If this standard is difficult to meet, that is because it was meant to be." *Harrington*, 562 U.S. at 102.

Here, the Illinois Appellate Court applied the correct rule, the Supreme Court's two-pronged test for ineffective-assistance-of-counsel claims from *Strickland*, 466 U.S. 668. To prove ineffective assistance of counsel, the petitioner must show that: (1) counsel's performance "fell below an objective standard of reasonableness"; and (2) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *King*, 834 F.3d at 813 (quoting *Strickland*, 466 U.S. at 687–88).

When applying *Strickland* to the facts of a particular case, "there is no reason for a court … to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. The goal of ineffective-assistance-of-counsel claims "is not to grade counsel's performance," so when "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice … that course should be followed." *Id.* That is the case here, so we move immediately to the prejudice prong of the analysis.

The Illinois Appellate Court affirmed the trial court's denial of McDaniel's petition for postconviction relief because he was not be prejudiced by appellate counsel's failure to raise a nonmeritorious claim. The court held that Officer Blackman's description of the man pulling the garbage can created probable cause to arrest McDaniel. The district court

disagreed, and we agree with its analysis: "Officer Blackman's description … would surely have described a substantial number of men living in the area." (R. 34 at 17.) The description alone did not create an individualized suspicion that McDaniel killed Moore, and thus, did not create probable cause. *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000).

The state points to additional evidence that it argues created probable cause: (1) how close the address on the garbage can lying next to Moore's body was to McDaniel's address; (2) that McDaniel knew why the officers were at his house; and (3) that McDaniel acted nervous and fidgety when the police entered his house. Whether the combined evidence creates probable cause is debatable. Probable cause is not a question we need to address here, however, because McDaniel's confession would be admissible even if we assume that his arrest was unlawful.

Evidence obtained as the result of an unlawful search or seizure is often inadmissible under the Supreme Court's exclusionary rule, *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963), but not always.

The attenuation doctrine is an exception to the exclusionary rule. "A confession obtained through custodial interrogation after an illegal arrest must be excluded from evidence unless the confession is attenuated enough from the illegal arrest that the confession is 'sufficiently an act of free will to purge the primary taint.'" *United States v. Reed*, 349 F.3d 457, 463 (7th Cir. 2003) (quoting *Brown v. Illinois*, 422 U.S. 590, 602

(1975)). So long as the confession is voluntary,[3] our analysis focuses on "whether the confession is obtained by exploitation of an illegal arrest." *Brown*, 422 U.S. at 603. To determine whether a confession is free from the taint of an unlawful arrest, we consider "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct … ." *Brown*, 422 U.S. at 603–04 (internal citations omitted).

*1. Temporal Proximity*

Both sides agree that McDaniel confessed over twenty-four hours after being arrested. If we were to view temporal proximity in isolation, we would hold that the confession was temporally disconnected from the arrest. Twenty-four hours far exceeds the length of time that most courts have held disconnects a confession from an illegal arrest. *Reed*, 349 F.3d at 463–64 (collecting cases).

The time gap is not dispositive here, however, because McDaniel was in custody the entire twenty-four hours, did not talk to a lawyer, was questioned multiple times, and was subjected to a corporal lineup. *Taylor v. Alabama*, 457 U.S. 687, 691 (1982). In such a situation, a lengthy period of time between an arrest and confession does not serve to attenuate the arrest; we could hardly say that an illegal arrest had no effect on a confession just because the suspect was kept in interrogation for over twenty-four hours. *United States v. Conrad*, 673 F.3d 728, 738 (7th Cir. 2012) (noting that not only

---

[3] We assume that the confession was not coerced because McDaniel does not argue that he was coerced into confessing. See footnote 2.

is the "time elapsed" important but also "the *quality* of that time"). Therefore, the first factor favors suppression.

*2. Intervening Circumstances*

There are two intervening events that attenuate McDaniel's confession from his arrest. First, the interrogating officers read McDaniel his *Miranda* rights before they questioned him. Although *Miranda* warnings do not *per se* remove the scourge of an unlawful arrest, they "are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest." *Brown*, 422 U.S. at 603. So even though the warnings are not dispositive, they are a factor in our analysis and tend to support attenuation.

Second, the arresting officers had probable cause to arrest McDaniel before they began interrogating him. *See Utah v. Strieff*, 136 S. Ct. 2056, 2062–63 (2016) (holding that an independent arrest warrant served as an intervening event between an unlawful stop and search incident to arrest). At some point between the time the officers left to question McDaniel and the time they left his house for the police station, Officer Blackman identified McDaniel in a photo-array lineup. While the arresting officers were on their way back to the station with McDaniel, they were informed of Officer Blackman's identification.[4] A single, credible eyewitness

---

[4] Although we analyze potential intervening circumstances from the defendant's perspective in this context, McDaniel does not deny that he was made aware of Officer Blackman's photo identification. *See Reed*, 349 F.3d at 463 (noting that the question is whether the confession is attenuated enough from the illegal arrest that the confession is sufficiently an act of *defendant's* free will to purge the primary taint) (quoting *Brown*, 422 U.S. at 602); *see also United States v. Gregory*, 79 F.3d 973, 980 (10th Cir. 1996) ("In applying the second factor in *Brown*, we look only from the

identification can create probable cause. *Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015).[5] Had the officers not put McDaniel in handcuffs briefly and waited minutes to put him in the police car, they would have had probable cause for the arrest.

Importantly, Officer Blackman's identification was wholly independent of the arrest. In *Taylor*, the Supreme Court held that an arrest warrant filed after an illegal arrest but before the confession was not an intervening circumstance. 457 U.S. at 692–93. In that case, the arrest warrant was based on a fingerprint match between the suspect and fingerprints

---

defendant's perspective in determining whether any intervening event occurred which isolates the defendant from the coercive effects of the original illegal stop so as to render his subsequent consent voluntary in fact.").

[5] McDaniel argues throughout his brief that Officer Blackman's photo-array identification was "tentative." During the identification, Officer Blackman said that McDaniel's photo "look[ed] like" the man he saw pulling the garbage can. Multiple officers testified that this was a tentative identification. But that fact does not change our analysis. An officer has probable cause based on an eyewitness who "it seems reasonable to believe is telling the truth." *Gramenos v. Jewel Cos., Inc.*, 797 F.2d 432, 439 (7th Cir. 1986) (internal quotation marks omitted). Such an identification can create probable cause even if the officers know of other evidence that might lead a jury to conclude that the eyewitness had misidentified the suspect. *Tangwall v. Stuckey*, 135 F.3d 510, 516 (7th Cir. 1998) (citing *Gramenos*, 797 F.2d at 437). Officer Blackman's identification was sufficient to create probable cause. There was no reason to doubt that Officer Blackman was telling the truth, and it was reasonable to rely on Officer Blackman's statement that McDaniel "look[ed] like" the man pulling the garbage. The weight to give the "tentative" identification would have been for the jury to decide. *United States v. Carter*, 410 F.3d 942, 950 (7th Cir. 2005).

found at the crime scene. The fingerprints used to match the ones at the crime scene were taken immediately after the illegal arrest, making them fruit of the illegal arrest. The Court held that, as a result, the arrest warrant did not constitute an intervening event. *Id.*

Here, Officer Blackman's identification did not rely on anything that stemmed from the arrest. The officers knew McDaniel's name, knew that he fit Officer Blackman's general description of the man pulling the garbage can, and got his picture without relying in any way on the arrest. *See Segura v. United States*, 468 U.S. 796, 814 (1984) ("None of the information on which the warrant was secured was derived from or related in any way to the initial entry into petitioners' apartment; the information came from sources wholly unconnected with the entry and was known to the agents well before the initial entry.").

The second factor, the existence of intervening circumstances, favors admissibility.

### 3. Flagrancy of Police Misconduct

The flagrancy of police misconduct is the most important element of our analysis because the exclusionary rule is aimed at deterring police misconduct. *Reed*, 349 F.3d at 464–65 (citing *Brown*, 422 U.S. at 600). "The third factor of the attenuation doctrine reflects that rationale by favoring exclusion only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant." *Strieff*, 136 S. Ct. at 2063.

When an officer's conduct is negligent but not flagrant or purposeful, the exclusionary rule's objective is not served and strongly favors admissibility. *Id.* Good-faith mistakes,

resulting from errors in judgment, "hardly rise to a purpose-ful or flagrant violation of … Fourth Amendment rights." *Id.*

In *Strieff*, an officer stopped Strieff leaving a suspected drug house without reasonable suspicion of wrongdoing. The Court said that the officer violated Strieff's Fourth Amendment rights and instead should have asked Strieff to talk instead of demanding that he do so. Notwithstanding the Fourth Amendment violation, the Court concluded that the third prong of the *Brown* test was not satisfied because the officer made a good-faith mistake and did not act purposefully or flagrantly.

The same rationale applies here. Two officers testified that they went to McDaniel's house only to investigate Moore's death and that they did not think that they had probable cause to arrest him at that time. At no point did the officers think that they were arresting McDaniel. McDaniel consented to all of the officers' conduct: entry into his house, the initial questioning at his house, the search of his house, and going to the police station for further questioning. *See United States v. Rahman*, 805 F.3d 822, 831 (7th Cir. 2015). The trial court held that McDaniel was in custody for purposes of the Fourth Amendment when the officers handcuffed him at his house and later drove him to the police station. But the officers told McDaniel that he was not under arrest and took him out of the handcuffs five minutes later while still at his house. Further, McDaniel consented to going to the police station. Officers in future situations could scarcely hope to be more careful than the officers were here. These mistakes, if they were mistakes, constitute negligence. And as was the case in *Strieff*, everything that occurred after the initial arrest was legal. 136 S. Ct. at 2063.

Although the officers acted in good faith, that is only part of the inquiry when analyzing the purpose and flagrancy of the officers' conduct. *Reed*, 349 F.3d at 465. The Supreme Court has held that an officer's conduct is purposeful and flagrant in absence of bad faith when the officers used the unlawful arrest as an investigatory method to discover evidence.[6] *Taylor*, 457 U.S. at 693; *Dunaway v. New York*, 442 U.S. 200, 218 (1979); *Brown*, 422 U.S. at 605. McDaniel relies on the language in those cases to argue that his "arrest has a 'quality of purposefulness' in that it was an 'expedition for evidence' admittedly undertaken 'in the hope that something might turn up.'" (Appellant's Reply Br. at 25 (quoting *Dunaway*, 442 U.S. at 218).)

Of course, the officers went to McDaniel's house to investigate Moore's death and hoped that their investigation would turn up evidence during questioning. But the similarities between our case and the Supreme Court cases end there. In the Supreme Court cases, the officers—regardless of their belief about probable cause—intended to arrest the suspect. *Taylor*, 457 U.S. at 688–89; *Dunaway*, 442 U.S. at 203; *Brown*, 422 U.S. at 592. Excluding evidence in those cases served to deter future officers from arresting an individual unless they were sure that they had probable cause. Here, the officers did not intend to arrest McDaniel. Excluding McDaniel's confession would not deter this type of conduct:

---

[6] The Court has held that the lack of coercion during the interrogation does not mean that an officer's conduct was not flagrant or purposeful. *Dunaway*, 442 U.S. at 218–19. The officers' conduct during interrogation is not at issue here. Accordingly, we do not address whether the officers' conduct during McDaniel's interrogation adds to the flagrancy of their conduct.

officers would still have to investigate crimes before they have probable cause and would continue to rely on various witnesses' and suspects' consent when doing so.

To quote the Supreme Court, "[A]ll the evidence suggests that the [arrest] was an isolated instance of negligence that occurred in connection with a bona fide investigation … ." *Strieff*, 136 S. Ct. at 2063. The officers' conduct was not flagrant or purposeful, and thus, application of the exclusionary rule is not warranted. That, in addition to the intervening events, attenuated the confession from the arrest. As a result, McDaniel cannot show prejudice because the confession would have been admissible even if his arrest was unlawful.

### III. CONCLUSION

For the foregoing reasons, the district court's denial of McDaniel's petition for a writ of habeas corpus is AFFIRMED.