In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 23-2833

LESTER SUMRALL and LESTER SUMRALL FAMILY TRUST,

*Defendants/Counterclaim Plaintiffs/Third-Party Plaintiffs-Appellants,*

*v.*

LESEA, INC., *et al.*,

*Plaintiffs/Counterclaim Defendants/Third-Party Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:18-cv-00914 — **Philip P. Simon**, *Judge.*

———————————

ARGUED MAY 13, 2024 — DECIDED JUNE 12, 2024

———————————

Before SCUDDER, ST. EVE, and PRYOR, *Circuit Judges.*

ST. EVE, *Circuit Judge.* A family member may harbor a grudge for decades, not acting on a perceived injustice for many long years. He may not, however, turn to the courts for aid after such a long delay. Take this case: decades after a patriarch's death, his son and grandson claim they should have inherited part of his estate. They are too late. We affirm.

## I. Background

Dr. Lester Frank Sumrall founded a church that became an empire. At its peak the Lester Sumrall Evangelical Association (now LeSEA, Inc., or "LeSEA") spread its message from South Bend, Indiana around the world through television, its ministry feeding the poor, and Dr. Sumrall's own travels, writings, and media productions. Those writings and productions were prolific: Dr. Sumrall registered 43 copyrights in his own name for books and films, and many other works went unregistered or were registered to LeSEA itself.

Dr. Sumrall involved his family in LeSEA's business and ministry. He had three sons: Frank, Peter, and Stephen. Each worked in the ministry. When the three had children of their own, those grandchildren likewise joined the family business. The eldest grandchild is Lester Sumrall, one of the plaintiffs here. Lester and his namesake, Dr. Sumrall, were close. As a boy, Lester would travel with his grandfather. Then, when Lester was eighteen, he went to work for Dr. Sumrall (as head of LeSEA), serving as both associate pastor and assistant. The travel continued, but at that point the two men would travel to a church, preach, and solicit donations. Someone—usually another LeSEA employee—would take photos. Then they would return home, using the donations and photos to further LeSEA's ministry.

One 1994 trip saw Lester and Dr. Sumrall travel deep into China, with the goal of supporting oppressed Chinese Christians. The pair was accompanied only by two interpreters, so this time Lester took the photos. Some show Dr. Sumrall speaking to a large local crowd. In one with special significance here, the "Traveler Photo," Lester captured Dr. Sumrall

posing with an elderly Chinese man. On the way home, Lester had the photos developed in Hong Kong.

Two years later Dr. Sumrall passed away. That had two consequences relevant here. First, a LeSEA employee named Charles Strantz asked Lester if he had any photos suitable for use in a memorial article for Dr. Sumrall. Lester gave Strantz some of the photos from the China trip. Today LeSEA has some of the negatives. Lester has others. Neither has the Traveler Photo's negative.

Second, Lester's uncles Peter and Stephen took over the ministry. (His father Frank briefly stayed on as an associate pastor.) The uncles told Frank and others that Dr. Sumrall had left everything to the ministry, for Dr. Sumrall habitually kept assets in LeSEA—donating a home, for example, to the ministry as a parsonage.

Fast-forward eight years.

In late 2004 or early 2005, rumor had it that Lester's cousin Andrew planned to move into the long-vacant parsonage that had been Dr. Sumrall's home. When Lester investigated, he found Andrew in the old parsonage wielding a blowtorch. It seemed Andrew had used the torch to open the closet safe and laid out Dr. Sumrall's personal possessions: jewels, coins, cash. Thinking Andrew had no right to Dr. Sumrall's things, Lester researched Indiana's intestate succession law, realizing that if Dr. Sumrall had died without a will, his father should have inherited a one-third interest in Dr. Sumrall's estate. Not long after, Lester went back to the house and saw Andrew had further rearranged its contents. So Lester contacted his father—by then in Florida—to secure a power of attorney

enabling him to pursue his father's interest in Dr. Sumrall's things. That was all. Lester took no next step for twelve years.

At Christmas in 2016, Frank and Lester visited Stephen at his home. For the first time, Stephen acknowledged that Dr. Sumrall *had* left a will, but said he would have to look for it. As it turned out, LeSEA had the will locked among its files. Lester petitioned an Indiana probate court in April 2017 to open an estate for Dr. Sumrall. In response, another of his cousins produced the will and at last Lester came to know Dr. Sumrall's testamentary intentions. He had left some personal items to grandchildren, with the rest of his estate going to his sons in equal measure. Still, the probate court denied the petition. The estate, it explained, was empty after all this time. It held no assets.

In the meantime, Lester created a competitor to LeSEA called "LeSEA Broadcasting Corporation." LeSEA then sued both Lester and the new entity for infringing its trademarks. This is that case. But those trademark claims resolved when Lester stipulated to an injunction against use of LeSEA's name; this appeal does not touch them.

Instead, we deal today only with counterclaims Lester and the Lester Sumrall Family Trust (a vehicle for Frank's interest) brought against LeSEA, its affiliate corporations, and Lester's uncles and cousins now involved in the ministry (together "LeSEA"). They claim LeSEA took ownership of Dr. Sumrall's copyrights, which should rightfully have been theirs. They complain that LeSEA uses Lester's Traveler Photo in its materials. They quarrel with LeSEA's continuing use of Dr. Sumrall's right of publicity. And they bring a bevy of other state law claims, too. Between its motions to dismiss and for

summary judgment, LeSEA prevailed on all these claims in the district court.

Lester and the Trust appealed, raising various issues. Their arguments fail to persuade us.

## II. Analysis

### A. Copyright Claims

Start with the copyright claims. The Trust's claim for Dr. Sumrall's works is untimely, while Lester's Traveler Photo claim fails because LeSEA owns the photo's copyright.

#### 1. Dr. Sumrall's Works

The Copyright Act bars suits three years after the claim accrues. 17 U.S.C. § 507(b). The time that a claim accrues differs depending on its nature. When it aims at ownership (as here), rather than infringement, a claim accrues "when plain and express repudiation of co-ownership is communicated to the claimant." *Consumer Health Info. Corp. v. Amylin Pharms., Inc.*, 819 F.3d 992, 996 (7th Cir. 2016) (cleaned up). Repudiation might result from a contract assigning the rights, *id.* at 994, or from a demand letter threatening copyright enforcement action, *see Gaiman v. McFarlane*, 360 F.3d 644, 653 (7th Cir. 2004).

Here repudiation happened in 1996, approximately 28 years ago. After all, Stephen and Peter told the world their father "wanted everything to go to the ministry." Frank's wife (who now bears his general power of attorney) submitted a declaration positing that Stephen and Peter long maintained Dr. Sumrall "gave everything to the ministry." No clearer repudiation is required; the brothers asserted in "plain and express" terms that the corporation they controlled owned the copyrights—along with the rest of the estate.

Were that not enough, Lester's 2005 intestate succession research also shows repudiation. We have approved of cases holding the claim accrues as soon as "a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right." *Consumer Health*, 819 F.3d at 997 (quoting *Kwan v. Schlein*, 634 F.3d 224, 228 (2d Cir. 2011)). And Lester and Frank were on inquiry notice about their right, for they *did* inquire and *did* conclude LeSEA owed Frank his one-third interest.

The Trust argues, too, that repudiation can only occur if the claimant knows she has ownership rights. It grounds that theory in *Stone v. Williams*, 970 F.2d 1043 (2d Cir. 1992). But *Stone* says nothing of the sort. To the contrary, the case held "the legal rights that stem from certain facts or circumstances need not be known, only the facts or circumstances themselves." *Id.* at 1049. In fact, *Stone* (also an inheritance case) held the plaintiff "had notice of her claim" as soon as she professed that her mother had told her Hank Williams, Sr., the famous country star, "might be her natural father." *Id.* at 1048. Here, Frank always knew Dr. Sumrall was his father, and the relevant "facts or circumstances" came into focus as soon as Dr. Sumrall passed away and Frank's brothers asserted LeSEA's rights. As Frank's son, Lester naturally knew the same. The claim accrued when they acquired that knowledge in 1996, or at latest when they acted on it in 2005.

### 2. The Traveler Photo

Lester's copyright claim for the Traveler Photo also fails. The defendant, LeSEA, owns (and thus cannot infringe) the copyright. "In the case of a work made for hire, the employer … is considered the author" for copyright purposes. 17 U.S.C. § 201(b). In turn, a "work made for hire" is one "prepared by an employee within the scope of his or her employment." *Id.*

§ 101. LeSEA employed Lester during the China trip, so we ask only whether he took the Traveler Photo within the scope of his employment.

He did. The parties agree that the Restatement (Second) of Agency § 228 (2004) controls the analysis. We proceed on that assumption. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). The test provides: "Conduct of a servant is within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the master." Restatement (Second) of Agency § 228.

Lester has often taken a broad view of his work for Dr. Sumrall. In a deposition, he framed the job as personal service to Dr. Sumrall "in whatever he needed." On a LinkedIn page, he expanded that role still further to encompass international travel, public speaking, and efforts to promote LeSEA's ministry. In short, Lester performed a wide array of work around the world, always at Dr. Sumrall's behest: he "served [Dr. Sumrall] personally." All the law asks is that his "purpose, however misguided, [was] wholly or in part to further the master's business." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 756 (1998). And given the unity between Dr. Sumrall and LeSEA—and the fact that LeSEA was Lester's formal employer here—we know Lester saw his personal service to Dr. Sumrall as coextensive with his LeSEA employment.

With all that in mind, no reasonable jury could conclude this photo fell outside that scope. Lester's job was to promote LeSEA (through Dr. Sumrall) and its (his) work abroad. When no cameraman came to deep rural China, Lester stepped in. Indeed, it was these capacious "time and space limits" on

Lester's work that positioned him to take the photo, which af-
ter all depicts Dr. Sumrall engaged in LeSEA's work. And
Lester's purpose to serve his master is clear—when asked to
memorialize Dr. Sumrall for LeSEA, Lester turned the photos
over right away. Summary judgment was proper.

**B. Laches**

The district court also confronted sundry state law claims
for damages, which it dismissed under the doctrine of laches.
"In civil matters this ancient equitable doctrine consists of
three elements: inexcusable delay in asserting a right; implied
waiver from knowing acquiescence in existing conditions;
and circumstances resulting in prejudice to the adverse
party." *In re Geisler*, 614 N.E.2d 939, 940 (Ind. 1993).

True, as the district court acknowledged, laches normally
runs against equitable claims. But in Indiana, laches is
"equally available in suits at law." *Richmond State Hosp. v.
Brattain*, 961 N.E.2d 1010, 1012 (Ind. 2012). We have said much
the same, reasoning that "laches … is the mirror image of eq-
uitable estoppel," which also tolls damages claims. *See Team-
sters & Emp'rs Welfare Tr. of Ill. v. Gorman Bros. Ready Mix*, 283
F.3d 877, 880–81 (7th Cir. 2002). Resisting this conclusion, the
Trust points to *SCA Hygiene Products Aktiebolag v. First Quality
Baby Products, LLC*, 580 U.S. 328, 333–34 (2017). That Supreme
Court case held "applying laches within a limitations period
specified by Congress would give judges a 'legislation-over-
riding' role that is beyond the Judiciary's power." *Id.* at 335.
Indeed, the Trust makes no other argument on appeal, resting
solely on this argument about laches's application at law.

This difference between state and federal laches law im-
plicates the *Erie* doctrine, which calls on federal courts

applying state law to use state substantive law and federal procedural rules. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010). "[T]he doctrine [though typically applied in diversity cases] applies equally to state law claims [arising] through supplemental jurisdiction," like this one. *Houben v. Telular Corp.*, 309 F.3d 1028, 1032 (7th Cir. 2002). Laches—just like a statute of limitations—is substantive. *Hollander v. Brown*, 457 F.3d 688, 694 (7th Cir. 2006). So Indiana's laches law controls, and that law provides that laches is "equally available in suits at law." We thus affirm the use of laches here, especially given the long delays. *See SMDfund, Inc. v. Fort Wayne-Allen Cnty. Airport Auth.*, 831 N.E.2d 725, 729–30 (Ind. 2005) (laches after seventeen-year delay).

**C. Right of Publicity**

Finally, the Trust asks us to revive its claim for LeSEA's alleged use of Dr. Sumrall's right of publicity—that is, his name, image, likeness, and other personal identifiers. Under Indiana law, it can maintain this claim only if it owns at least half Dr. Sumrall's right of publicity. *See* Ind. Code § 32-36-1-18(a). It tried to plead that ownership by alleging Frank was "the rightful full owner of Dr. Sumrall's Works." But it defined "Dr. Sumrall's Works" to *exclude* the right of publicity, later in the same counterclaim complaint defining "Dr. Sumrall's IP" as "Dr. Sumrall's Works and right of publicity." No doubt, then: the allegations about the Works' ownership exclude the right of publicity. That being so, the district court dismissed the Trust's claim for failing to plead the required half-ownership.

The Trust falls back on reminding us that a court "should freely give leave [to amend] when justice so requires." Fed. R.

Civ. P. 15(a)(2). It forgets that by the time the district court ruled, the deadline for amendment had passed. Not by a little, either: two years had gone by. In such cases, Fed. R. Civ. P. 16(b)(4) requires a party to modify the schedule before pursuing an amendment. So post-deadline amendments create a "two-step process." *Alioto v. Town of Lisbon*, 651 F.3d 715, 719 (7th Cir. 2011). First a party seeking amendment must show "good cause for modifying the scheduling order." *Id.* at 720. Only then may we reach the Rule 15 question.

Here we cannot get that far. On the Rule 16(b) issue, "the primary consideration for district courts is the diligence of the party seeking amendment." *Id.* When a party presents an "insufficiently robust explanation of why [it] was diligent," there is no good cause. *Id.* Here, the Trust gives no explanation at all. That suggests none is possible—especially since the Trust had already amended its counterclaims three times.

One last point. The Trust now contends that, even without owning half the right of publicity, it can bring a claim for an accounting. *See* Ind. Code § 32-36-1-18(b). That theory is new on appeal and thus waived. *See Homoky v. Ogden*, 816 F.3d 448, 455 (7th Cir. 2016). And at any rate—notwithstanding its representations at oral argument—the Trust never pleaded a basis for such a claim. The allegations it identifies speak only to "use" of the right of publicity, never ownership.

### III. Conclusion

The appellants brought us a plethora of issues—none of which rescues the long-delayed counterclaims. Put another way: this appeal is too much, too late.

AFFIRMED.