In the

# United States Court of Appeals
## For the Seventh Circuit

No. 23-2662

KIONTAE MACK,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:19-cv-4001 — **Lindsay C. Jenkins**, *Judge.*

ARGUED SEPTEMBER 4, 2024 — DECIDED AUGUST 13, 2025

Before ROVNER, BRENNAN, and LEE, *Circuit Judges.*

LEE, *Circuit Judge.* After a jury acquitted him of various crimes, Kiontae Mack brought suit against Chicago Police Department (CPD) officers and the City of Chicago under 42 U.S.C. § 1983. Mack alleged, among other things, that the officers violated his constitutional rights when they detained him without probable cause, fabricated evidence to support his prosecution, and coerced an involuntary confession from him. The district court granted summary judgment for

Defendants. Because the CPD officers' detention of Mack was based on arguable probable cause, entitling them to qualified immunity; Mack's acquittal precludes his claim of fabricated evidence; and his confession was not used against him in any court proceeding, we affirm.

**I**

**A**

Shortly before 2:30 a.m. on August 25, 2012, Stephin Williams and Breonna Clausell sat in a parked car near 49th Street and Drexel Avenue. Williams was in the driver seat; Clausell was in the front passenger seat. Clausell saw two men walk by. The men then turned around, walked back, and stopped in front of the parked car. At Clausell's urging, Williams put the car in reverse and tried to leave.

At that point, one of the men—later identified as Michael Tucker—raised a gun and instructed Williams to park the car and unlock the doors. After Williams complied, the two men stood at each side of the car—Tucker at the driver side, and the other man at the passenger side. Tucker took Williams's phone and wallet, and the other man took Clausell's purse. Williams tried to fight Tucker off, but when that failed, Williams exited the car and started to run away. Tucker then shot Williams and fled with the other man. Rushing to where Williams fell, Clausell called 911.

The parties disagree on the identity of the second man. Defendants maintain that Tucker's accomplice was Mack and that the two men fled together in the same direction after Tucker shot Williams. Mack, on the other hand, denies that he was the second man; rather, on the night of the incident, Mack says, he was sitting with other people on the steps of a nearby

building when he saw Tucker approach Williams's car with another individual. Mack fled the scene when he heard gunshots and started walking down 49th Street alone.

CPD officers Thomas Barnes and Michael Ray were the first to arrive at the crime scene. Clausell told Barnes that two black men, one of them lighter skinned and wearing a white polo-type shirt, had just robbed her and shot Williams. The officers broadcasted this information over the radio.

Meanwhile, at about 2:30 a.m., University of Chicago Police Department (UCPD) officers Eric James and Randy Carter responded to a radio call of shots fired in the area. According to Defendants, the UCPD officers spotted Mack walking with Tucker on 49th Street. As their vehicle turned onto 49th Street, the UCPD officers saw Tucker run down an alley. After relaying this information over the radio, the officers stopped Mack to question him.

According to Mack, he was stopped by UCPD officers around 2:30 a.m. on 49th Street, but he denies that he had been walking with anyone else prior to the stop. He was not carrying any weapons or contraband, and he cooperated with the officers.

During this stop, UCPD officers James and Carter heard over the radio that one of the assailants was a lighter complected black male wearing a light-colored polo-type shirt. According to Defendants, this matched the description of the person whom the UCPD officers saw running down the alley before they stopped Mack. The officers then placed Mack in a police car. Meanwhile, another UCPD officer had arrested Tucker based on the description that had been broadcast over

the radio. James and Carter confirmed that the arrestee was the same person they saw running down the alley.

Back at the crime scene, CPD Sergeant Terry Hoover arrived soon after receiving a radio call about the incident. Hoover had heard descriptions of the suspects being put out over the radio. He spoke with Clausell, who repeated her description of the shooter as a lighter skinned black male wearing a white polo-type shirt. Clausell could not provide a description of the other assailant but stated that she could maybe identify him if she saw him. Upon learning that UCPD had two suspects in custody, Hoover requested UCPD to bring them to the scene to conduct a "show-up." Within a couple of minutes, UCPD officers arrived in two cars carrying Tucker and Mack separately.

Mack's show-up, which lasted five to ten seconds, involved Hoover opening the back door of the UCPD car, pointing his flashlight at Mack's face, and asking Clausell if she recognized him as one of the assailants. Mack, who was seated about six to eight feet from Clausell, heard her say that she was "not sure" if he was the other assailant. Hoover heard Clausell say that Mack was "not the person who shot the victim" but that "he might be the person who was with" the shooter. Police reports either described Clausell's identification of Mack as a "tentative" identification or indicated that Clausell "could not positively identify" Mack. Tucker's show-up was more conclusive; Clausell said she was "sure" he was the shooter.

About an hour later, CPD Detective William Davis arrived at the scene. Davis interviewed Clausell, who told him that she had "identified" both Tucker and Mack as the assailants.

Following the show-up, Tucker and Mack were brought to the police station around 3:44 a.m. and placed in separate interview rooms. Prior to being questioned, Mack was permitted to use the bathroom upon request and to sleep.

CPD Detectives David Roberts and Paul Maderer, who assisted Detective Davis with the investigation, began interviewing Mack at 6:30 a.m. The detectives read Mack his *Miranda* rights, which Mack waived by agreeing to speak with the detectives.

Mack initially denied any involvement in the robbery or shooting, telling the detectives that he had sat and watched the incident unfold from his nearby perch. Roberts pushed back, telling Mack that he knew Mack was at the car, but that Mack had to "take it from there." Often using profanity-laced language, the detective repeatedly told Mack that he wanted to avoid charging Mack with murder, which could result in fifty years in prison.

About ten minutes into the interview, Mack confessed to the robbery. He shared specific details from that night, including that he had first walked past Williams's car before returning to it, that Tucker pulled out his gun when the driver turned on the car, and that he remembered seeing "three females" in the car. Mack also told the detectives that Tucker might have taken Clausell's purse and that, when the driver got out of the car to run, Tucker shot him, and Mack fled. However, Mack never admitted to fleeing the scene with Tucker after the shooting or being alongside him in the minutes after.

The entire interview lasted about sixteen minutes. After the interview, the detectives allowed Mack to use the

bathroom, provided him with something to eat, and let him sleep in between interview sessions.

Mack was woken up around 11:25 a.m. for an interview with Assistant States Attorney (ASA) Kevin Deboni. Deboni identified himself as a prosecutor and informed Mack of his *Miranda* rights, which Mack again waived. During his twenty-minute conversation with Deboni, Mack repeated his admission to the robbery. He mostly recounted the same details he had shared with Roberts and Maderer several hours earlier.

Roberts and Maderer also interviewed Clausell. After she informed them that she "did identify" the two suspects at the show-up, the detectives showed Clausell two photos, one of Tucker and one of Mack. Maderer later explained that they showed Clausell these photos in order to, among other things, make sure that "the demographics were correct." Roberts stated that "[i]t was just a confirmation" so that he could "be quite certain that Michael Tucker was the one who fired a firearm and Kiontae Mack was the one who took her purse."

After talking with the detectives, Clausell spoke with ASA Deboni. Roberts was there as well. Responding to Deboni, Clausell once again identified Mack as the second assailant and, according to Roberts, appeared "very confident" in doing so.

Deboni later approved murder and robbery charges against Tucker and Mack. In September 2012, a grand jury indicted both men for first degree murder, armed robbery, and various other offenses.

In June 2017, Tucker and Mack were tried at the same time by separate juries. At the trial, Clausell identified Mack as the man who had stood by the passenger side of Williams's car.

She explained that she was able to identify Mack at the show-up after she had had "a better look," recognizing his hair, clothing, and the visible part of his face. Tucker was convicted; Mack was acquitted. By the time of his acquittal, Mack had been detained for almost five years.

**B**

After his release, Mack sued the City of Chicago and CPD officers Hoover, Barnes, Davis, Roberts, and Maderer (collectively the "Individual Defendants") under 42 U.S.C. § 1983. Relevant to this appeal, Mack's claims alleged (1) illegal pretrial detention in violation of the Fourth Amendment against the Individual Defendants; (2) evidence fabrication in violation of the Fourteenth Amendment against the Individual Defendants; (3) coerced confession in violation of the Fifth and Fourteenth Amendments against Roberts and Maderer; and (4) malicious prosecution against Davis, Roberts, and Maderer.

The parties filed cross-motions for summary judgment, and the district court ruled in favor of Defendants on all claims. This appeal followed.

**II**

We review grants of summary judgment *de novo*, "examining the record in the light most favorable to the nonmovant and construing all reasonable inferences from the evidence in his favor." *Moore v. W. Ill. Corr. Ctr.*, 89 F.4th 582, 590 (7th Cir. 2023) (first citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); and then citing *Tolliver v. City of Chicago*, 820 F.3d 237, 241 (7th Cir. 2016)). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## A

We begin with Mack's Fourth Amendment claim against CPD officers Hoover, Barnes, Davis, Roberts, and Maderer. The Fourth Amendment "establishes the minimum constitutional 'standards and procedures' not just for arrest but also for ensuing 'detention.'" *Manuel v. City of Joliet*, 580 U.S. 357, 365 (2017) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)). Specifically, the Amendment "prohibits government officials from detaining a person in the absence of probable cause." *Id.* at 367. This protection covers detentions that occur both before the start of legal process and those that happen after. *See id.* at 366–67. This means that pretrial detention is unlawful "when the police hold someone without any reason before the formal onset of a criminal proceeding," and also "when legal process itself goes wrong—when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements." *Id.* at 367.

Mack asserts that the CPD officers lacked probable cause, not only for his initial arrest but also throughout his years-long detention. Defendants counter that the officers did have probable cause to detain Mack and that, in any event, the officers are entitled to qualified immunity.

Probable cause exists if the "totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Pryor v. Corrigan*, 124 F.4th 475, 486 (7th Cir. 2024) (quoting *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 714 (7th

Cir. 2013)). "But even if an officer's probable cause assessment is mistaken, qualified immunity may protect him from liability." *Mwangangi v. Nielsen*, 48 F.4th 816, 825 (7th Cir. 2022).

For qualified immunity to attach under these circumstances, "an officer needs only 'arguable' probable cause." *Huff v. Reichert*, 744 F.3d 999, 1007 (7th Cir. 2014). "If an officer has arguable probable cause—meaning that 'a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law'—we cannot say that the officer violated the plaintiff's clearly established constitutional rights." *Mwangangi*, 48 F.4th at 825 (quoting *Huff*, 744 F.3d at 1007) (citation modified).

We need not delve into the question of whether the Individual Defendants had probable cause to detain Mack, because we are satisfied that they each had at least *arguable* probable cause.

**1**

We start with Sergeant Hoover. When Hoover spoke with Clausell after arriving at the crime scene, she told him that she might be able to identify the second assailant if she saw him. When she saw Mack at the show-up, Clausell said that she was not sure, but that Mack "might be" the person who was with the shooter. This identification, even if tentative, was sufficient to support at least arguable probable cause. *See McDaniel v. Polley*, 847 F.3d 887, 895 n.5 (7th Cir. 2017) (credible witness's tentative identification can create probable cause); *see also Holloway v. City of Milwaukee*, 43 F.4th 760, 769 (7th Cir. 2022) (citing *McDaniel* for the proposition that "a single

witness's identification from a photo array, even if tentative, can establish probable cause"), *cert. denied*, 143 S. Ct. 1083 (2023).

In *McDaniel*, a police officer observed a man pulling a garbage can into a high school parking lot at 2 a.m. and exiting empty handed. 847 F.3d at 891. About seven hours later, other officers found a dead woman's body lying next to a bloodied garbage can in the same parking lot. *Id*. The officer subsequently identified the plaintiff in a photo-array lineup, saying that the plaintiff's photo "look[ed] like" the man he saw pulling the garbage can. *Id*. at 891, 895 n.5. This identification resulted in the plaintiff's arrest, and upon release he filed suit. In response to the plaintiff's repeated complaints that the identification was merely tentative, we stressed that this "does not change our analysis," because "[a]n officer has probable cause based on an eyewitness who it seems reasonable to believe is telling the truth." *Id*. at 895 n.5 (internal quotation marks omitted).

We referenced this concept again in *Holloway*, where the plaintiff matched the descriptions of the attacker offered by five victims, had a prior conviction for crimes similar to the one being investigated, and was tentatively identified by one of the victims in a photo array. 43 F.4th at 769. There, we concluded that "these facts establish probable cause, notwithstanding the tentative nature of [the victim's] identification." *Id*. (citing *McDaniel*, 847 F.3d at 895 n.5).

Mack attempts to distinguish *McDaniel* and *Holloway*, pointing to the fact that the eyewitness in each case stated that the subject "look[ed] like" or "resembled" the offender, whereas Clausell used more conditional language. We agree that Clausell's language was less definitive than that in

*McDaniel* or *Hollaway*. But officers can consider the reliability of the witness as well as the quality of the identification to assess probable cause. Here, with Clausell's credibility not in dispute, the officers understandably gave her identification substantial credence.

But Clausell's tentative identification was not the sole basis for Hoover's decision to detain Mack. Recall that Hoover believed that the descriptions of the offenders had been put out over the radio. When he arrived at the crime scene, Hoover was told that UCPD officers had detained suspects they believed might be the offenders. At the show-up, Clausell took just five to ten seconds before telling Hoover that Mack "might be" the person that accompanied Tucker, whom she was "sure" was the shooter. Faced with these facts, a reasonable officer in Hoover's position "*could* have reasonably believed that probable cause existed in light of well-established law." *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998) (internal quotation marks omitted). Thus, even if Hoover did not have probable cause to detain Mack, he had *arguable* probable cause, entitling him to qualified immunity.

The same is true for Davis. Upon arriving at the scene, the detective was informed that Clausell had "tentatively identified" Mack. When Davis later interviewed Clausell, she told him that she *had* "identified" both Tucker and Mack as the offenders. Davis still understood Clausell's identification at this point to be tentative. But as with Hoover, Davis "could have mistakenly believed that probable cause existed" based on Clausell's tentative identification. *Humphrey*, 148 F.3d at 725; *see also McDaniel*, 847 F.3d at 895 n.5.

Roberts and Maderer are also covered by qualified immunity, although for slightly different reasons. When the two

detectives interviewed Clausell, neither had been informed that her identification of Mack at the show-up was "tentative." To the contrary, Clausell told them directly that she "did identify" Tucker and Mack at the scene, one as the shooter and the other as the person who took her purse. Moreover, the detectives also had Mack's confession that he was the second assailant. Based on the undisputed facts, we agree with the district court that Roberts and Maderer had at least *arguable* probable cause to detain Mack.

**2**

Mack also claims that the Individual Defendants violated his Fourth Amendment rights by fabricating police reports and improperly showing Clausell a single photograph of Mack to support his detention. "Obviously, law enforcement officers 'may not knowingly use false evidence, including false testimony, to obtain a tainted conviction.'" *Coleman v. City of Peoria*, 925 F.3d 336, 344 (7th Cir. 2019) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). But a claim based on the alleged fabrication of evidence poses a "high bar to clear": Mack must prove not only that Clausell's identification as described in the officers' reports was false, but also that the officers "manufactured" it. *Id.* (quoting *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012)).

We turn first to Mack's assertion that the Individual Defendants fabricated police reports to manufacture Clausell's tentative identification. In support, he contrasts Barnes's initial case incident report (which noted that Clausell "could not positively identify" Mack), with Barnes's subsequent arrest report (which stated that Mack "was tentatively identified" as the second assailant). To Mack, this discrepancy not only creates a factual dispute as to whether Clausell tentatively

identified him at all, but also suggests that the officers fabricated the identification. As Mack remembers it, what Clausell actually said was that she was unsure if Mack was the second offender.

We see no material inconsistency between Mack's account and the varying police reports. Admittedly, the several police reports documenting the show-up differed slightly in their descriptions of Clausell's identification. But the police reports agree on this much: Clausell did not positively identify Mack, but she thought he may have been the culprit (although she was not sure) and did not rule him out. As Barnes and Hoover each explained, a witness, who is unsure about an identification she gives, can fairly be described as giving a tentative identification. Furthermore, even if the variation in wording across police reports constitutes a material inconsistency, nothing in the record suggests that the officers caused Clausell to give them a statement that "they knew—with certainty—was false." *Coleman*, 925 F.3d at 344. Without more, Mack cannot clear the "high bar" to substantiate his fabrication-of-evidence claim. *Id*.

Mack also contends that Detectives Davis, Roberts, and Maderer falsely reported that Clausell had identified Mack at the show-up. But, again, Mack offers no facts to support this narrative, only speculation. This is not enough to survive summary judgment.

Nor can Mack show that the detectives' purported fabrication of Clausell's statement tainted Deboni's decision to prosecute him. Instead of relying solely on the detectives' accounts, Deboni interviewed both Clausell and Mack himself. Additionally, Clausell "very confident[ly]" identified Mack to Deboni as the second man, and she explained to Deboni that

she could identify Mack "specifically by his hair and by the upper features of his face." Deboni also heard Mack confess to his part in the robbery and murder. As such, Deboni's own interviews with Clausell and Mack independently provided grounds for Mack's prosecution.

Turning to the photograph, in Mack's view, Roberts and Maderer's use of his photo during their interview of Clausell was unduly suggestive. It is true that "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Stovall v. Denno*, 388 U.S. 293, 302 (1967), *abrogated on other grounds by United States v. Johnson*, 457 U.S. 537 (1982). But here, Clausell had already informed Roberts and Maderer that she had identified both arrestees at the scene *before* the detectives presented her with the photographs. What is more, in addition to Clausell's identification of Mack, the detectives also heard Mack's confession. Thus, even without Clausell's identification of Mack in the photograph, the detectives had at least arguable probable cause to detain Mack.

**3**

Mack also claims that the Individual Defendants violated his Fourth Amendment rights by causing his detention without probable cause following the issuance of his indictment. *Manuel*, 580 U.S. at 366–67.[1] But Mack's claim against the Individual Defendants cannot prevail because the Individual Defendants did not cause his post-legal-process detention.

---

[1] For purposes of *Manuel*, Mack's appearance before the state court for his bond hearing on August 27, 2012, would also constitute legal process.

"To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right." *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (citation omitted). Mack therefore needs to establish "some causal connection or affirmative link between the action complained about and the official sued." *Id*. (citation omitted).

Here, Mack cannot show that the Individual Defendants caused his pretrial detention following the grand jury indictment. This is because "the chain of causation is broken by an indictment, absent an allegation of pressure or influence exerted by the police officers, or knowing misstatements made by the officers to the prosecutor." *Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996); *see also Manuel*, 580 U.S. at 367 (a police officer may be liable for causing the "legal process itself [to go] wrong" if "a judge's probable-cause determination is predicated solely on [the officer's] false statements").

By the time of the grand jury indictment, the evidence included not only the police reports that Mack alleged were fabricated, but also Clausell's positive identification of Mack, as well as Mack's confessions to the detectives and Deboni. Indeed, a grand jury indictment is "prima facie evidence of probable cause." *Coleman*, 925 F.3d at 351 (citation omitted). And Mack has presented no evidence the CPD officers "obtained the indictment through improper or fraudulent means." *Id*. Accordingly, Mack's post-legal-process pretrial detention was properly supported by probable cause. *See Manuel*, 580 U.S. at 368.

**4**

Turning to Mack's malicious prosecution claim, he singles out Davis, Roberts, and Maderer and believes they wrongfully initiated the charges against him. The Supreme Court has recognized malicious prosecution claims under the Fourth Amendment. *See Thompson v. Clark*, 596 U.S. 36, 42 (2022) (citing *Manuel*, 580 U.S. at 363–64, 367–68). And, as the Supreme Court has held, "the gravamen of the Fourth Amendment claim for malicious prosecution … is the wrongful initiation of charges without probable cause." *Id*. at 43.

Thus, like Mack's illegal pretrial detention claim, the absence of probable cause is the keystone of Mack's malicious prosecution claim. *See Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015) ("Probable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest, false imprisonment, or malicious prosecution.") (internal quotation marks omitted). Here, because Davis, Roberts, and Maderer had arguable probable cause to detain Mack for the reasons explained, they are entitled to qualified immunity as to Mack's malicious prosecution claim. *Cf. Burritt*, 807 F.3d at 249–51 (qualified immunity based on arguable probable cause justified summary judgment on state malicious prosecution claim); *Washington v. City of Chicago*, 98 F.4th 860, 878 (7th Cir. 2024) ("Plaintiffs' claims for malicious prosecution fail for the same reason that their Fourth Amendment claims fail—the detectives and courts had probable cause to detain them.").

**B**

We now address Mack's fabricated-evidence claim under the Fourteenth Amendment (as opposed to the Fourth

Amendment). As we recently explained, "[a] claim for a false arrest or pretrial detention based on fabricated evidence implicates the Fourth Amendment protection against seizures without probable cause, whereas a claim that fabricated evidence was later used at trial to obtain a conviction violates a defendant's rights under the Due Process Clause of the Fifth and Fourteenth Amendments." *Zambrano v. City of Joliet*, 141 F.4th 828, 830 (7th Cir. 2025) (citation omitted).

Mack "may have suffered a violation of his due-process right to a fair trial [under the Fourteenth Amendment]" if "fabricated evidence [was] later used at trial to obtain a conviction." *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020). For this Fourteenth Amendment claim, Mack must show that (1) the CPD officers knowingly fabricated evidence that was used against him at trial; (2) the evidence was material; and (3) Mack was damaged as a result. *See id.*; *see also* Fed. Civ. Jury Instructions 7th Cir. § 7.14 (2017).

Mack's due process claim cannot prevail for the simple reason that he was acquitted. "The essence of a due-process evidence-fabrication claim is that the accused was *convicted and imprisoned* based on knowingly falsified evidence[.]" *Patrick*, 974 F.3d at 835 (emphasis added). Here, the jury did not convict Mack of any crimes, and Mack has not alleged any post-trial deprivation of liberty. Because he was not "damaged" by the admission of any evidence, Mack's Fourteenth Amendment argument fails.[2]

---

[2] Mack's claim doubly fails because the CPD officers' reports were never introduced as evidence (*i.e.*, "used") against Mack at trial.

## C

Finally, we turn to Mack's claim that Detectives Roberts and Maderer coerced his confession in violation of the Fifth and Fourteenth Amendments. The Self-Incrimination Clause of the Fifth Amendment provides that "[n]o person … shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In addition to making the Fifth Amendment applicable to the states, the Fourteenth Amendment extends its protection to statements given in response to interrogation. *See Carrion v. Butler*, 835 F.3d 764, 775 (7th Cir. 2016) ("A foundational principle of due process of law is that the state cannot procure a criminal conviction through the use of an involuntary confession.") (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 223–26 (1973)).

To prove a Fifth Amendment violation, a plaintiff must show not only that the confession was coerced but also that his coerced confession was used against him in a criminal case. *See Chavez v. Martinez*, 538 U.S. 760, 767 (2003) (compelled statements "may not be used against a defendant at trial … but it is not until their use in a criminal case that a violation of the Self-Incrimination Clause occurs") (citation modified). The "courtroom use" could occur during a trial or a pretrial proceeding. *Id.* at 777 (Souter, J., concurring); *see Sornberger v. City of Knoxville*, 434 F.3d 1006, 1027 (7th Cir. 2006) (finding Fifth Amendment violation where coerced confession was introduced as evidence of guilt at a probable cause hearing, a bail hearing, and an arraignment proceeding).

Here, Mack already conceded that his confession was not used at his criminal trial. He therefore is left to argue on appeal that the confession was used during a hearing on his

motion to suppress the confession. But because Mack did not raise this argument before the district court, it is waived. *See Sumrall v. LeSea, Inc.*, 104 F.4th 622, 630 (7th Cir. 2024) (considering as waived a new theory presented on appeal).

That said, even if this argument were not waived, it fails on the merits because Mack's confession was not "used" by the government as testimony against him during the suppression hearing. The whole purpose of the hearing—held on Mack's motion—was to determine whether the government *could* use the confession at trial. The district court held that the government could, and the government subsequently decided against it. Mack was not "compelled … to be a witness against himself" during the hearing in any fashion. U.S. Const. amend. V.[3]

### III

For the above reasons, we AFFIRM the district court's judgment.

---

[3] Because Mack's confession was not used against him in court, we need not decide whether the confession was unlawfully coerced to resolve this appeal.